11 CIV 4383

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARL BRAUN, derivatively on behalf of ADVANCED BATTERY TECHNOLOGIES, INC., | : |
| Plaintiff, | : JURY TRIAL DEMANDED |
| v. | : Civil Action No. |
| ZHIGUO FU, GUOHUA WAN, GUOPENG GAO, HONGJUN SI, LIQUI BAI, JOHN MCFADDEN, YULIN HAO, NING LI, SHAOQIN XIA, SHIYAN YANG, COSIMO PATTI, and CHI YUAN XUE, | : |
| Defendants, | : |
| And, | : |
| ADVANCED BATTERY TECHNOLOGIES, INC., | : |
| Nominal Defendant. | : |



JUN 28 2011

U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Carl Braun ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Advanced Battery Technologies, Inc. ("ABAT" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties from March 16, 2009 to the present (the "Relevant Period").

**NATURE OF THE ACTION**

1.      ABAT describes itself as a developer, manufacturer, and distributor of rechargeable polymer lithium-ion batteries. The Company describes its products to include rechargeable batteries for mine-use lamps, electric automobiles, motorcycles, cellular phones, notebook computers, and other personal electronic devices.  The Company originally went public through a reverse merger transaction with a shell company called Buy It Cheap.com in 2004 and claims to have increased its revenues from $11,000 in 2003 to $97 million in 2010.

2.      This case arises from the misappropriation of Company resources by the Company's Chairman of the Board, Defendant Zhiguo Fu ("Fu"), who appears to have transferred ownership of ABAT's key subsidiary to himself without adequate compensation or justification, and a series of materially false and/or misleading statements to investors and the public made by Defendants including, among other things, (a) that ABAT makes cutting-edge electric cars, when in fact it produces cheap scooters and bicycles; (b) that ABAT increased revenue from $4.2 million to $97.1 million from 2005 to 2010; (c) that ABAT has certain distribution relationships which appear to be fake; (d) that ABAT spent $20 million to acquire a company linked to defendant Fu without disclosing the relationship; and (e) ABAT issued 11 million shares to defendant Fu and other individuals to repay a "loan" which was fabricated.

3.      These materially false and/or materially misleading statements were brought to light on March 30, 2011 when a report by Varient View Research ("Varient") entitled "Advanced Battery Technologies (ABAT): The Most Egregious Chinese RTO" (the "Report") was published on the financial website Seeking Alpha.  In reaction to the Report, the price of the Company's stock fell by $1.50 per share, or approximately 43%, to close at $2.01 per share on March 30, 2011.

4.      The report stated that the "financial statements and management of ABAT cannot be trusted and therefore the stock is worth zero" because:

1.      The Chairman appears to have transferred ownership of ABAT's key subsidiary to himself without explanation or compensation;

2.      ABAT leads investors to think that it makes cutting-edge electric cars, when in fact it produces cheap scooters and bicycles;

3.      ABAT claims unrealistic margins in what it admits is a commodity space;

4.      ABAT claims to have increased revenue from $4.2 million to $97.1 million from 2005 to 2010 while DECREASING its employee count;

5.      ABAT claims distribution relationships which appear to be fake;

5.      ABAT is a serial issuer of equity at low prices;

7.      ABAT spent $20 million to acquire a company linked to the Chairman without disclosing the relationship;

8.      ABAT spent $22 million or 7x sales to acquire a failing and possibly related company;

9.      ABAT issued 11 million shares to the Chairman and other individuals to repay a "loan" which appears to be entirely fabricated;

10.     Despite a parade of auditors and multiple restatements, ABAT still has material weaknesses;

11.     ABAT's RTO promoter, John Leo, is behind a number of suspicious Chinese reverse mergers, most notably CYXI; and

12.     No fundamental institutions are significant shareholders.

6.      Filings with the State Administration for Industry and Commerce ("SAIC"), the administration with which businesses that operate in China file their financial statements reveal that ABAT is reporting significantly lower revenue and profit to the authorities in China than it is

in the United States.  For 2009, ABAT reported less than $2 million in revenue in SAIC filings, compared to $64 million in SEC filings.

7.     Another research report, this one dated May 5, 2011 prepared by Prescience Investment Group took the investigation a step further by talking with ABAT's customers and even hiring inspectors to visit several of ABAT's manufacturing plants.  Prescience's report suggested that ABAT's facilities were severely overhyped and not equipped for cutting-edge production methods that could make ABAT's numbers even feasible.

8.     Through their actions and inaction, Defendants have harmed the Company by causing it to issue materially false and misleading statements and omit material facts, resulting in a loss of significant Company value, and by exposing ABAT to federal securities violations. Indeed, as a result of Defendants' wrongful acts and omissions, the Company is now exposed to millions of dollars in defense costs and potential liability.  Defendants were fully aware of the false statements and yet they breached their fiduciary duties and caused significant harm to the Company.

9.     Defendants owe ABAT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, Defendants had a duty to promptly and timely disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

10.    Plaintiff seeks to recover damages suffered by the Company as a result of the wrongful acts of its directors and officers described herein.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in

that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds

$75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the

state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive

one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     Venue is proper in this Court under 28 U.S.C. §1391(a) because (1) one or more

defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion

of the transactions and wrongs complained of herein, including the defendants' primary

participation in the wrongful acts detailed herein, occurred within this District, and defendants

have received substantial compensation in this District by conducting business herein and by

engaging in numerous activities that have had an effect in this District.

## THE PARTIES

13.     Plaintiff, a resident of Columbus, Georgia, is a current shareholder of ABAT and

has held ABAT stock during the Relevant Period and continues to hold today.

14.     Nominal defendant ABAT is a Delaware corporation with its principle executive

offices located at 15 West 39th Street, Suite 14A, New York, NY 10018.  ABAT is a holding

company with one direct subsidiary, Cashtech Investment Limited ("Cashtech").  Cashtech is

also a holding company with two subsidiaries: Harbin ZhongQiang Power-Tech Co., Ltd. ("ZQ

Power-Tech"), which manages the assets and operations of Heilongjiang ZhongQiang Power-

Tech Co., Ltd. ("HLJ ZQPT"); and Wuxi ZhongQiang Autocycle Co., Ltd., which is engaged in

the business of manufacturing and distributing electric vehicles that utilize batteries

manufactured by HLJ ZQPT. HLJ ZQPT manufactures and distributes polymer lithium-ion

batteries. In May 2009, ABAT completed the acquisition of Wuxi Angell Autocycle Co. Ltd. and was renamed Wuxi Zhongqiang Autocycle Co., Ltd. ("Wuxi ZQ" or "Wuxi Angell"). Wuxi ZQ manufactures and distributes electric vehicles. ABAT also owns a 49% interest in Beyond E-Tech, Inc. ("BET") which distributes cellular telephones in the United States.

15.     Defendant Zhiguo Fu has served as the Company's Chairman and Chief Executive Officer at all relevant times.   In 2002 Defedant Fu organized the Company's subsidiary, ZQ Power-Tech.  Upon information and belief Defendant Fu is a resident of China.

16.     Defendant Guohua Wan ("Wan") is a director of the Company and has been since 2004. From 2005 through 2007, Wan was the Chief Financial Officer ("CFO") of ABAT. In March 2009, Wan was reappointed to the position of CFO of ABAT. Wan is also the General Manager of ZQ Power-Tech.   Upon information and belief Defendant Wan is a resident of China.

17.     Defendant Guopeng Gao ("Gao") has served as a director of the Company since 2005.  Gao has served as the Vice President and General Manager of ZQ Power-Tech.  Upon information and belief Defendant Geo is a resident of China.

18.     Defendant Hongjun Si ("Si") has served as a director of the Company since 2005. Since 2002, Si has served as the Chief Technology Officer of ZQ Power-Tech.   Upon information and belief Defendant Si is a resident of China.

19.     Defendant Liqui Bai ("Bai") has served as a director of the Company since 2005. Bai has served as Vice General Manager of ZQ Power-Tech since 2002.  Upon information and belief Defendant Bai is a resident of China.

20.     Defendant John J. McFadden ("McFadden") has served as a director of the Company since 2007.    McFadden serves as the chairman of the Company's Audit Committee.  Upon information and belief Defendant McFadden is a resident of New York.

21.     Defendant Ning Li ("Li") has served as a director of the Company since 2007. Upon information and belief Defendant Li is a resident of China.

22.     Defendant Shaoqui Xia ("Xia") has served as a director of the Company since 2007.  Upon information and belief Defendant Xia is a resident of China.

23.     Defendant Shiyan Yang ("Yang") has served as a director of the Company since 2007.  Upon information and belief Defendant Yang is a resident of China.

24.     Defendant Cosimo J. Patti ("Patti") has served as a director of the Company since 2007.  Patti is a member of the Company's Audit Committee.  Upon information and belief Defendant Patti is a resident of New York.

25.     Defendant Yulin Hao ("Hao") served as a director of the Company from 2007 until June 24, 2010.  Hao also served as a member of the Audit Committee.  Upon information and belief Defendant Hao is a resident of China.

26.     Defendant Chi Yuan Xue ("Xue") has served as a director of the Company since 2010. Xue is a member of the Audit Committee.  Upon information and belief Defendant Xue is a resident of China.

27.     Collectively, defendants Fu, Wan, Gao, Si, Bai, McFadden, Hao, Li, Xia, Yang, Patti, and Xue  shall be referred to herein as "Defendants."

28.     Collectively, defendants McFadden, Xue, Patti, and Hao are referred to as the "Audit Committee Defendants."

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

29.     Defendant ABAT describes itself as a developer, manufacturer, and distributor of rechargeable polymer lithium-ion batteries. The Company's products include rechargeable batteries for mine-use lamps, electric automobiles, motorcycles, cellular phones, notebook computers, and other personal electronic devices.

30.     ABAT's main operating business is the manufacturing and sale of polymer lithium-ion batteries. In 2009, the Company also acquired a business that makes and sells electric and hybrid powered motorbikes, scooters and SUVs. In the year ended December 31, 2010, batteries comprised 55% of sales and electric vehicles comprised 45% of sales.

31.     The Company went public in July 2004 through a reverse merger. ABAT controls two main operating subsidiaries: Heilongjiang ZQPT and Wuxi ZQ. Heilongjiang ZQPT operates the battery business; it was set up in 2002 and its manufacturing facilities first became operational in 2004. Wuxi ZQ operates the motorbikes/scooters business and was purchased by ABAT in May 2009.

32.     Advanced Battery Technologies, Inc. owns Cashtech, which owns two key subsidiaries. The first is Harbin ZhongQiang Power-Tech Co., Ltd. ("Harbin ZQPT"), which "holds the government lease of the real property on which [the] battery operations are located". Harbin ZQPT manages Heilongjiang ZQPT, which is the actual operating subsidiary.

33.     The second subsidiary owned by Cashtech is Wuxi ZQ, which was acquired in 2009 and manufactures electric vehicles powered by ZQ Power-Tech batteries. Prior to being acquired, this company was called Wuxi Angell Autocycle Co., Ltd.

34.     According to its SEC filings, below are the Company's historical revenue and EBITDA, which are in fact a fiction.

8



35.     Out of the 106 companies provided by Bloomberg in the "Batteries/Battery Systems" classification, Bloomberg records the EBIT margins for 79 of them.  ABAT reports a 39% EBIT margin.  Only three other companies report EBIT margins above 20%, one of which is NEWN, another suspect Chinese reverse merger company.  Only 10 companies report EBIT margins above 15%.

36.     ABAT, a company with less than $100 million of sales is an extreme outlier.

**False and Misleading Statements**

37.     On November 24, 2008, ABAT issued a press release commenting on its capacity expansion program which the Company claimed would "substantially increase production by 2010 in order to meet the Company's robust sales pipeline." In the press releases, Defendant Fu stated:

> We are please that our solid financial health and balance sheet allow us to invest, as planned, in new equipment and in our ability to meet new and existing orders. We do not need to approach the capital markets to achieve our near-term growth plans and we look forward to updating shareholders about our enhanced production capacity in the future.

38.     On March 16, 2009, the Company issued a press release announcing its financial results for 2008. For the year, the Company reported revenues of $45.2 million and net income of $16.1 million, or $0.31 per fully diluted share.

39.     Defendant Fu commenting on the results stated, in pertinent part, as follows:

We are encouraged by the strong performance our company produced in 2008. We were able to grow revenue in excess of 40% while cutting overhead costs and controlling the cost to manufacture our products. The market for our large and medium capacity battery cells continues to expand, particularly for usage in electric sanitation vehicles, electric scooters, electric bicycles, power tools, miners' lamps, searchlights and other applications.

In December of 2008, we announced our intent to acquire 55% of Wuxi Angell, a manufacturer of electric vehicles, including electric bikes, agricultural transport vehicles and electric sports utility vehicles. The benefits of our relationship with Wuxi Angell have already been seen as evidenced by the introduction of our three new hybrid motorcycles, which debuted in February of 2009.

Even in this difficult economic environment, Advanced Battery will continue to strive to develop leading clean technology battery products, improve manufacturing efficiencies, and to increase margins as demand for our products continues to grow.

40.     The press release also stated "[t]he Company believes that the global recession will make it difficult to equal the revenue growth rate of 2008, but that the Company will continue to grow through new customers and strategic alliances.

41.     On March 16, 2009, the Company filed its annual report for the period ended December 31, 2008 on a Form 10-K with the SEC, which was signed by Defendants Fu, Wan, Gao, Si, Bai, McFadden, Hao, Li, Xia, Yang, and Patti.

42.     The 2008 10-K contained the same false and misleading statements concerning the Company's reported revenue as the March 16, 2009 press release, reporting revenues of $45.2 million and net income of $16.1 million, or $0.31 per fully diluted share.

43.     The 2008 10-K stated in part:

**(a)         Evaluation of disclosure controls and procedures.**

The term "disclosure controls and procedures" (defined in SEC Rule 13a-15(e)) refers to the controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files under the Securities Exchange Act of 1934 (the "Exchange Act") is recorded, processed, summarized and reported, within time periods specified in the rules and forms of the Securities and Exchange Commission.  "Disclosure

controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

The Company's management, with the participation of the Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this annual report (the "Evaluation Date"). Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the Evaluation Date, such controls and procedures were effective.

44.     In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-K

contained signed certifications by Defendants Fu and Wan, stating:

1. I have reviewed this annual report on Form 10-K of Advanced Battery Technologies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and

the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the small business issuer's internal controls over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officers and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal controls over financial reporting.

45.     On May 11, 2009, the Company issued a press release announcing its financial results for the first quarter of 2009. The Company reported revenue of $10.7 million and net income of $3.6 million, or $0.07 per diluted share.  In the press release, Defendant Fu stated that the Company was "optimistic about our continued growth in the remainder of the year and currently our backlog for the battery business is approximately $64 million as of early May."

46.     With regard to the acquisition of Wuxi Angell, Defendants stated, in pertinent part, as follows:

The Company signed a definitive acquisition agreement with Wuxi Angell Autocycle Co. Ltd. ("Wuxi Angell") on April 28, 2009 and closed the acquisition in early May.

Mr. Zhiguo Fu, Chairman and CEO of Advanced Battery Technologies, commented, "We are excited to announce that we have completed the acquisition of Wuxi Angell. The acquisition of Wuxi Angell provides the Company entry to the growing electric and hybrid-electric bike market. The benefits of our relationship with Wuxi Angell are evident in the introduction of three new hybrid motorcycles, which debuted in February 2009, and by our recently announced contracts for various types of electric vehicles and hybrid-electric vehicles, with an aggregate contract amount of $24 million."

47.    On May 11, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on Form 10-Q with the SEC, which was executed by Defendants Fu and Wan reiterating the financial information it announced in the above press release. The 10-Q also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

48.    On May 27, 2009, ABAT issued a press release announcing its 3 year financial projections for its Wuxi Angell acquisition. The press release stated, in pertinent part:

Wuxi ZhongQiang currently has 4 production lines in operation with production capability of 100 vehicles per day per line. The facility currently operates at lower than 20% of total capacity and expects to achieve its projections by increasing orders and maximizing production efficiency.

For the period of May through December of 2009, the Company believes Wuxi ZhongQiang will contribute revenue of $35.0 million - $37.5 million and gross profit of $9.2 million to $9.7 million.

For 2010, the company believes that growth in domestic and international demand for its products will continue and Wuxi production will reach approximately 2/3 of current capacity, or contribute $55.0 million to $65.0 million revenue, by the end of next year. For 2011, the company expects to utilize at least 80-85% of current capacity.

Mr. Zhiguo Fu, Chairman and CEO of Advanced Battery Technologies, stated, "We are very excited about the growth potential we see at Wuxi ZhongQiang.

> Wuxi ZhongQiang has world class production facilities that can handle the growing demands for electric and hybrid electric vehicles. Demand is strong in both domestic and international markets as individuals and industries shift to electric and hybrid vehicles and newenergy cars. Whereas most companies focus either on battery manufacturing or electric vehicle manufacturing, ABAT is now uniquely positioned as it has manufacturing capability in both the battery and electric vehicle market. Wuxi's and ABAT's combined manufacturing capabilities including the ability to produce vehicles, batteries and many key vehicle parts means Wuxi can produce high quality vehicles with margins that are superior to its competition."

49.     On May 28, 2009, the Company issued a press release announcing that it "agreed to sell convertible preferred stock and warrants to three institutional investors. The investors will purchase the preferred stock and warrants for $10 million cash."

50.     On June 15, 2009, the Company issued a press release announcing that it "agreed to sell additional convertible preferred stock and warrants to three of the institutional investors that purchased similar securities from Advanced Battery Technologies on June 1, 2009. The investors will purchase the additional preferred stock and warrants for $7 million cash."

51.     On August 11, 2009, the Company issued a press release announcing its financial results for the second quarter of 2009. The Company reported revenues of $13.8 million and a net income of $8 million, or $0.14 per diluted share.  In addition, the Company stated that "[b]attery backlog is approximately $53 million as of August 3, 2009, all of which is expected to be delivered in the next 12 months."  Defendant Fu commented on the results stating in pertinent part:

> We are pleased with our results during the second quarter. During the quarter, we successfully completed the acquisition of Wuxi ZQ and began integrating their operations with those of Advanced Battery. We expanded assembly capacity in our Harbin facility and it became fully operational late in the second quarter of 2009.  ABAT is experiencing strong demand in both domestic and international markets for electric and hybrid electric vehicles as individuals and industries switch to alternate forms of transportation. Following the completion of our acquisition of Wuxi ZQ, ABAT now has the manufacturing capability to produce

vehicles, batteries and many key vehicle parts, meaning Wuxi and ABAT can produce high quality vehicles with margins that are superior to its competition.

52.     On August 11, 2009, the Company filed a quarterly report for the period ended June 30, 2009 on Form 10-Q with the SEC, which was signed by Defendants Fu and Wan and reiterated the financial information it announced in the above press release. The 10-Q also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

53.     On August 17, 2009, the Company filed a shelf Registration Statement with the SEC on Form S-3 and on September 1, 2009 the Company filed an amended S-3 (collectively the "2009 Registration Statement").   The Registration Statement and its amendment were signed by Defendants Fu, Wan, Gao, Si, Bai, McFadden, Hao, Li, Xia, and Patti.   The Registration Statement and its amendment incorporated by reference ABAT's 2006-2008 financial statements.

54.     On September 15, 2009, the Company issued a press release providing an update on its Wuxi ZQ acquisition. In that regard, Defendants stated, in pertinent part, as follows:

> Since the acquisition closed in May 2009, ABAT has been integrating the operations of Wuxi ZQ into those of ABAT, including technical capabilities, marketing, production and human resources. The integration process between Wuxi ZQ and ABAT has enabled Wuxi to augment and improve its production scope and scale. Domestic merchants have increased orders of electric and hybrid electric bikes and scooters with Wuxi ZQ. In addition, Wuxi ZQ has received orders from new foreign customers, including those located in the Philippines, Switzerland, Israel, Czech Republic, Italy, Brazil, the United States, Chile, Denmark, the Netherlands, Germany, Hong Kong, Malaysia and India.

> Mr. Zhiguo Fu, Chairman and CEO of Advanced Battery Technologies, Inc., stated, "We are excited about the improving business trends of Wuxi ZQ. Dealers from around the world have come to value our product's excellent quality, superior technology and customer service. After placing small orders, several merchants are negotiating with us to enter into long term order contracts. As our

scale and production capabilities increase, Wuxi ZQ will promote and extend sales of electric bicycles and scooters to an increasing number of countries around the world."

55.    On September 30, 2009, the Company issued a press release announcing that it "agreed to sell common stock and warrants to institutional investors in a registered direct offering. . . . The investors have agreed to purchase 4,592,145 shares of common stock and 1,377,644 common stock purchase warrants. . . . The aggregate gross proceeds in the offering will be approximately $19,000,000."

56.    On October 1, 2009 the Company announced it had entered into an agreement to sell more than 4 million shares of common stock at $4.70 per share pursuant to the 2009 Registration Statement, and on October 7, 2009, the Company announced the completion of the sale for proceeds of more than $19 million.

57.    On November 9, 2009, the Company issued a press release announcing its financial results for the quarter ending September 30, 2009. The Company reported revenue of $17.7 million and a net income of $4.8 million, or $0.08 per diluted share.  Moreover, the Company stated that "[a]s of October 30, 2009, the Company had a backlog of over $67 million including a battery backlog of approximately $55 million, all of which is expected to be delivered in the next 12 months." Defendant Fu, commenting on the results, stated, as follows:

> We are pleased with our results during the third quarter. Following our acquisition of Wuxi ZQ in May 2009, we are excited to see positive momentum in the electric vehicle business continue in the third quarter, which helped to augment sales by signing new production contracts and expanding the international scope of our operations during the quarter.
>
> As we continue to integrate the operations of Wuxi ZQ into those of Advanced Battery, we are focused on expanding production capacities and enhancing R&D capabilities in an attempt to realize the synergies of ABAT and assure the Company of a leading position within the battery technology and vehicle production industry. We are confident that our ongoing efforts combined with our proven ability to deliver high-quality products continue to help ABAT tackle sales

opportunities in both domestic and international markets being created by the worldwide movement towards more economical and cleaner high performance vehicles.

58.     On November 11, 2009, the Company filed a quarterly report for the period ended September 30, 2009 on Form 10-Q with the SEC, which was signed by Defendants Fu and Wan and reiterated the financial information it announced in the above press release.  The 10-Q also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

59.     On March 31, 2010, the Company issued a press release announcing its financial results for 2009. For the fourth quarter of 2009, the Company reported a net income of $9.2 million, $0.14 per diluted share and revenue of $21.4 million. For the year, the Company reported a net income of $21.4 million, or $0.35 per diluted share and revenue of $63.6 million. income of $16.1 million, or $0.31 per diluted share.   In addition, the Company reported a "backlog of approximately $49.7 million for delivery throughout the next 12 months, including a battery backlog of approximately $44.3 million."

60.     On March, 31, 2010, the Company filed an annual report for the period ended December 31, 2009 on Form 10-K with the SEC ("2009 10-K"), which was executed by Defendants Fu, Wan, Gao, Si, Bai, McFadden, Hao, Li, Xia, and Yang, and reiterated the financial information it announced in the above press release.   The 10-K also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-K contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

61.     The 2009 10-K stated "since 2002, Wuxi ZQ has been engaged in the design, development, manufacture and marketing of electric- and hybrid-powered two wheel vehicles, as well as electric-powered agricultural transport vehicles and sport utility e-vehicles."

62.     On May 10, 2010, the Company issued a press release announcing its financial results for the quarter ending March 31, 2010. The Company reported a net income of $7.5 million, or $0.11 per diluted share and revenue of $19.5 million. In addition, the Company claimed that it had a "backlog of around $65 million for delivery throughout the next 12 months, including a battery backlog of approximately $51.4 million." Defendant Fu, commenting on the results, stated as follows:

> The increase in the portion of our revenue attributable to medium and large capacity batteries and electric vehicles has been beneficial to our overall business. The margins that we are able to achieve in selling larger capacity batteries are significantly greater than the margins we achieve in selling smaller capacity batteries, due primarily to the relative amount of competition in the different markets. We also show significant progress in our newly acquired electric vehicle business, which generated more sales to domestic and overseas customers in the first quarter and enhanced our top-line and bottom-line growth.

63.     On May 24, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on Form 10-Q with the SEC, which was signed by Defendants Fu and Wan and reiterated the financial information it announced in the above press release. The 10-Q also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

64.     On May 11, 2010 the Company issued a press release announcing its guidance for 2010. Specifically, the Company stated the following, in relevant part:

> Management is providing revenue guidance of $100 to $110 million and net income guidance of $32 to $36 million for 2010. Growth is expected to be driven by enhanced distribution of its electric vehicles, battery capacity expansion and

increased orders from domestic and international customers. This guidance excludes any impact from future acquisitions and fair value change of outstanding warrants.

Mr. Zhiguo Fu, CEO of ABAT, stated, "Advanced Battery is acutely aware of the current global economic conditions and we have cautiously moved forward with our business plan. However, the momentum from electric vehicle business that has moved us ahead with double digit increases in revenue over the past several quarters gives us the confidence to become more aggressive and state our guidance for fiscal 2010. We are excited about our plans for continued capacity expansion as well as obtaining a greater global reach for the distribution of our electric vehicles."

65. On August 9, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2010. The Company reported a net income of $12.5 million, or $0.18 per diluted share and revenue of $22.8 million. In addition, the Company stated that it had a "backlog of around $63.3 million for delivery throughout the next 12 months, including a battery backlog of approximately $50.5 million."

66. On August 9, 2010, the Company filed a quarterly report for the period ended June 30, 2010 on Form 10-Q with the SEC, which was signed by Defendants Fu and Wan and reiterated the financial information it announced in the above press release. The 10-Q also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

67. On November 15, 2010, the Company issued a press release announcing its financial results for the third quarter of 2010. The Company reported a net income of $11.1 million, or $0.16 per diluted share and revenue of $25.9 million. Moreover, the Company stated that it had a "backlog of approximately $55.4 million for delivery throughout the next 12 months, including a battery backlog of approximately $41.6 million." Defendant Fu, commenting on the results, stated, in pertinent part, as follows:

We are pleased to report an increase in our revenue attributable to medium and large capacity batteries and electric vehicles. This has been beneficial to the profitability of our overall business. The margins that we are able to achieve in selling larger capacity batteries are significantly greater than the margins we achieve in selling smaller capacity batteries. In order to meet higher demand from both battery and electric scooter markets, the company intends to accelerate growth by both adding more facilities and pursuing acquisition opportunities.

68.    On November 15, 2010, the Company filed a quarterly report for the period ended September 30, 2010 on Form 10-Q with the SEC, which was signed by Defendants Fu and Wan and reiterated the financial information it announced in the above press release.  The 10-Q also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

69.    On November 30, 2010, the Company issued a press release announcing that it "entered into agreements with several institutional investors for a registered direct placement of approximately $30 million of common stock at a price of $4.00 per share. The Company will issue a total of 7,500,000 shares to the institutional investors. In addition, the Company will issue to the investors warrants to purchase up to 3,750,000 shares of common stock, which, if fully exercised, would provide an additional $15 million in gross proceeds to the Company."

70.    On March 16, 2011, the Company filed an annual report for the year ending December 31, 2010 on Form 10-K with the SEC, which was signed by Defendants Fu, Wan, Gao, Si, Bai, McFadden, Li, Xia, Yang, Patti, and Xue.  The Company reported a net income of $36.7 million, or $0.48 per diluted share and revenue of $97.1 million.  The 10-K also contained statements regarding ABAT's disclosure controls similar to those contained in ¶ 44 above.   In addition, pursuant to SOX, the Form 10-K contained signed certifications by Defendants Fu and Wan, substantially similar to those contained in ¶ 45 above.

71.     In addition, in its Form 10-K, the Company represented the following marketing efforts by Wuxi ZQ:

Wuxi ZQ markets its electric vehicles primarily through a network of distributors in selected locations worldwide. Most of Wuxi ZQ's products carry both EEC and DOT(EPA) certification. During 2010, Wuxi ZQ recorded $22 million in sales abroad, to complement $27 million within China.

The worldwide distribution network for Wuxi ZQ vehicles increased substantially during 2010:

· On March 30 and 31, 2010 ZQ Power-Tech held a product promotion conference for its electric vehicles customers from both the domestic and the overseas markets.  Approximately two hundred people participated in the conference, including customers from Netherlands, Chile, Canada, India, Afghanistan, and over a hundred Chinese companies.

· In April 2010, during the International Bicycle Expo in Shanghai,  ZQ Power-Tech signed sales contracts totaling approximately $1.7 million (or 2,500 electric scooters) with European customers, including customers located in Germany, Denmark and the Netherlands.

· In May 2010 Wuxi ZQ signed an agreement with All-Power America to serve as the first U.S.-based distributor for Wuxi ZQ since the May 2009 acquisition.

· In September 2010 Menzaghi Motors of Italy placed an order for the aluminum magnesium alloy electric scooters that Wuxi ZQ recently developed to meet demand for a lighter-weight vehicle with higher mileage

· In October 2010 we signed an agreement with Kanuni Motorcycle, a well-known motorcycle producer in Turkey, under which Kanuni now sells three types of Wuxi ZQ scooters.

In addition to the distributors noted above, Wuxi ZQ's roster of distributors now includes

· Hi Motors and Ampere Vehicles Pte. Ltd. in India;
· Eco Style Di in Italy;
· DMS Motorlu Araclarsanayi Vetica in Turkey;
· Tinterparts Trading GmbH in Germany;
· Ersico Spol SRO in the Czech Republic;
· D.M.C. (DuurzaawMobiliteits) in the Netherlands;
· Floretti Europe BVBA in Belgium; and
· Autoplaza Holdings in the Philippines.

72.     On March 21, 2011, the Company issued a press release announcing its financial results for the period ended December 31, 2010. For the year, the Company reported a net income of $36.7 million, or $0.48 per diluted share and revenue of $97.1 million. For the fourth quarter, the Company reported a net income of $5.6 million, or $0.07 per diluted share and revenue of $28.8 million.

73.     Defendants' public statements described above were materially false and/or misleading because Defendants misstated among other things:  (1) that the Company's claimed distribution relationships with certain manufacturers of electric motorcycles and scooters appeared to be false; (2) that the Company reported financial statements that were grossly inflated by including gross profit margins which were unrealistic for similar companies in its industry; (3) that the Company lacked adequate internal and financial controls; (4) ABAT's facilities were severely overhyped and not equipped for cutting-edge production methods that could make ABAT's numbers even feasible; and (5) that as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

74.     Defendants' public statements described above were materially false and/or misleading because they failed to disclose facts that later came to light, including, among other things, (1) that the Company paid $1.5 million to acquire a company that is non-existent; (2) that the Company paid $20 million to purchase a company, but failed to disclose the related party nature of the transaction; and (3) that the Company paid $22 million to acquire Wuxi ZQ without disclosing that it was a bailout of a related company.

## The Truth Is Revealed

75.     On March 28, 2011, Varient View Research published a report entitled "Advanced Battery Technologies (ABAT): The Most Egregious Chinese RTO." The Report was republished on March 30, 2011 by *Seeking Alpha*. *See* Exhibit 1 attached hereto.  The Report contained unfavorable information on ABAT's business practices and claimed that the Company had, among other things, engaged in activities such as claiming unrealistic margins, falsified distribution relationships with certain manufacturers and issued stock to repay a loan to Defendant Fu.  The Report stated, in pertinent part, as follows:

I am short Advanced Battery Technologies (ABAT) for the following reasons:

1.  The Chairman appears to have transferred ownership of ABAT's key subsidiary to himself without explanation or compensation;

2.  ABAT leads investors to think that it makes cutting-edge electric cars, when in fact it produces cheap scooters and bicycles;

3.  ABAT claims unrealistic margins in what it admits is a commodity space;

4.  ABAT claims to have increased revenue from $4.2 million to $97.1 million from 2005 to 2010 while DECREASING its employee count;

5.  ABAT claims distribution relationships which appear to be fake;

6.  ABAT is a serial issuer of equity at low prices;

7.  ABAT spent $20 million to acquire a company linked to the Chairman without disclosing the relationship;

8.  ABAT spent $22 million or 7x sales to acquire a failing and possibly related company;

9.  ABAT issued 11 million shares to the Chairman and other individuals to repay a "loan" which appears to be entirely fabricated;

10. Despite a parade of auditors and multiple restatements, ABAT still has material weaknesses;

11. ABAT's RTO promoter, John Leo, is behind a number of suspicious Chinese reverse mergers, most notably CYXI;

12. No fundamental institutions are significant shareholders.

In short, I think that the financial statements and management of ABAT cannot be trusted and therefore the stock is worth zero.

*      *      *

## CONCLUSION

ABAT is the most egregious Chinese RTO I have seen. If the ownership status of HLJ ZQPT alone is not enough of a red flag, ABAT appears to have: A self-dealing management, falsely represented business description, serial equity issuances to acquire related or poor businesses, ludicrous profitability claims, customers that cannot be verified, multiple audit problems, the list goes on and on. This company has the dubious honor of achieving every major red flag that one looks for in a Chinese RTO fraud.

If CBEH is any guide, the market is eager to punish companies that do suspicious acquisitions funded by dilution. I would not want to be on the long side of this one.

76.    The complete report is attached hereto as Exhibit 1.  In reaction to the Report, the price of the Company's stock fell by $1.50 per share, or approximately 43%, to close at $2.01 per share on March 30, 2011.

77.    On April 6, Variant issued another report on Seeking Alpha, titled "Is Advanced Battery's $20M Acquisition a Complete Fabrication?"  The report stated in part:

In our previous report explaining why we are short Advanced Battery Technologies (ABAT), we claimed that "ABAT spent $20 million to acquire a company linked to the Chairman without disclosing the relationship." Further research confirms that the truth is even more nefarious than we initially believed. **The target company was not only related, but appears to be a company that ABAT had already acquired in 2008 for $1 million.** The announcement of a new acquisition appears to be a fabrication allowing Chairman Fu to funnel $20 million of shareholder funds out of the company into his own pocket. We also learned of disturbing allegations by the CEO of the company acquired in 2008. That individual alleges that ABAT's Chairman threatened his life in retaliation for a lawsuit over $600,000 worth of ABAT shares.  (Emphasis in original).

24

78.     The April 6, 2011 report is attached hereto as Exhibit 2.

79.     On April 6, the Company issued a press release responding to Variant's research report entitled "Advanced Battery Technologies (ABAT): The Most Egregious Chinese RTO" attempting to refute Variant's allegations.  The press release concluded by stating:

> To all of the investors or shareholders:
>
> We thank our investors and shareholders for their support, and regret that unscrupulous people like Variant View are trying to make a fast buck for themselves, at the expense of our investors, by providing false information and scaring our investors. Everyone loses -- except the short sellers. We implore our investors, and those who are interested in our company, that if you must read these defamatory statements, please read them carefully and note the difference between sourced and proven facts, like those we have provided above, and innuendo, unidentified individuals, and matters presented as fact but without any identifiable or credible source, as pervades the Variant View "report." We are confident that the Variant view will not survive that scrutiny.
>
> We sincerely invite you to visit our plants in China. All of the staff of ABAT are waiting for your arrival.

80.     On April 7, 2011, Variant posted a complete counterstatement to ABAT's response exposing the false and misleading nature of ABAT's statements.

81.     The April 6 press release contained numerous false and misleading statements, which directly contradict the Company's previous filings.  For example, in Variant's report it stated that ABAT misleads investors into thinking that it makes electric cars.  ABAT responded that "No person reading our SEC filings or looking at our website in good faith could draw the conclusion that ABAT manufactures electric cars."  However, an excerpt from ABAT's 10-K states "Since 2002, Wuxi ZQ has been engaged in the design, development, manufacture and marketing of electric- and hybrid-powered two wheel vehicles, as well as electric-powered agricultural transport vehicles and sport utility e-vehicles."

82.     Similarly in Variant's report it stated that ABAT overpaid for Wuxi Angell by spending $22 million on the acquisition.  ABAT responded stating "The purchase price paid by ABAT for Wuxi ZQ was $12.87 million (*cf* ABAT 2009 10-K, Note 3 to the Financial Statements), not $22 million."  However, an excerpt from ABAT's May 4, 2009 8-K/A it stated

In exchange for the equity in Wuxi Angell, ABAT agreed to pay U.S.$3,640,000 and 70 million Chinese Renminbi (approx. $10,248,902) in cash. In addition, Advanced Battery Technologies, Inc. issued three million shares of its common stock to the sellers.

|  | Units (mn) | U.S.D per unit | U.S.D (mm) |
|---|---|---|---|
| **U.S.D payment** | 3.64 | 1.00 | 3.64 |
| **RMB payment** | 70.00 | 0.15 | 10.20 |
| **ABAT Shares** | 3.00 | 2.64 | 7.92 |
| **Total** | | | 21.76 |

83.     Looking at the 2009 10-K which ABAT references, footnote 3 actually claims that the total purchase price is $9.87 million, not $12.87 million as ABAT now claims, meaning the Company has stated the total purchase price differently on three separate occasions.

84.     Variant's counterstatement is attached hereto as Exhibit 3.

85.     On April 15, 2011, "The Skeptical Investor" a self described "lawyer working in China, with a primary focus on M&A and private equity transactions" posted an article on Seeking Alpha which further questioned the legitimacy of ABTA.

86.     The April 15 article stated "the SAIC filings raise serious questions about the accuracy of ABAT's financial reporting to US investors. The differences between the financials reported in the Chinese SAIC filings and the SEC filings are dramatic."

87.     The article also stated in relevant part:

Advanced Battery Technologies (ABAT) is one of the latest Chinese reverse merger listing companies to be questioned about its US filings.

An article last week by Variant View Research alleged, among other things, that Advanced Battery Technologies had lied to US investors by hiding the fact that a Shenzhen company it reported as acquiring in December 2010 for $20 million in SEC filings had actually already been acquired by its management in 2008 for $1 million. As evidence, Variant View showed both printouts from the Chinese regulator's online database and US federal court documents filed by ABAT itself, confirming that the Shenzhen company had been purchased in 2008.

I have since obtained, through a local agent, ABAT's filings with the main Chinese corporate regulator, the State Administration of Industry and Commerce (SAIC). These filings confirm that ABAT's CEO, Fu Zhiguo, had indeed gained control of the Shenzhen company and become its sole director and legal representative in 2008.

Furthermore, the SAIC filings raise serious questions about the accuracy of ABAT's financial reporting to US investors. The differences between the financials reported in the Chinese SAIC filings and the SEC filings are dramatic.

According to the SAIC filings, ABAT's China entities lost money every year from 2006 to 2009, in contrast to the rising profits claimed in SEC filings.

For 2006, the SAIC filings show approximately $1.1 million in losses vs. $8 million in profits claimed in SEC filings.

For 2007, the SAIC filings show approximately $1.1 million in losses vs. $10.2 million in profits claimed in SEC filings.

For 2008, the SAIC filings show approximately $0.93 million in losses vs. $16.1 million in profits claimed in SEC filings.

And for 2009, the SAIC filings show approximately $3.9 million in losses vs. $21.3 million claimed in SEC filings.

88.     The April 15, 2011 article by "The Skeptical Investor" is attached hereto as Exhibit 4.

89.     On May 5, 2011, Eiad Asbahi, CFA, the founder and Managing Partner of Prescience Investment Group linked to a research report on ABAT prepared by Prescience Investment Group and Kerrisdale Capital through Seeking Alpha.

90.     The report presents what it terms "compelling evidence" that ABAT is "fabricating its SEC financial statements."  The report echoed the conclusions reached by the April 15 report relating to the dramatic difference between the SAIC and SEC filings and expanded upon them, stating in relevant part:

> In this report, we present compelling evidence that Advanced Battery Technologies, Inc. ("ABAT" or the "Company") is fabricating its SEC financial statements.  We believe that the Company's revenue and profit are highly overstated in its SEC filings. We have created a video where we discuss our findings: Part 1 is here and Part 2 is here. Our evidence includes:
>
> • SAIC filings show that ABAT is reporting significantly lower revenue and profit to the authorities in China. For 2009, SAIC filings showed less than $2 million of revenue, compared to $64 million in SEC filings.
>
> • ABAT has unreasonably high margins in an established industry with strong competitors. The Company's SEC-reported margins and return on capital are virtually impossible. Out of 106 global battery manufacturers as classified by Bloomberg, ABAT has the highest operating profit margin by a wide margin. When compared to six leading Chinese battery makers, ABAT's operating margin is triple that of its closest competitor and six times that of the median operating margin of the comparable companies.
>
> • Site visits show underutilized facilities lacking in quality control. We hired investigators to visit both the Harbin and Wuxi facilities, and provide photos as well as commentary from our investigators. Our investigators concluded that both facilities produce commodity, low-margin products that are highly unlikely to be generating industry-leading margins or return on capital.
>
> • In December 2010, ABAT announced that it was acquiring a Shenzhen battery maker for $20 million. We believe this acquisition is a sham, and that ABAT paid $20 million in 2010 for an entity that they had previously bought in 2008 for $1 million, but had not disclosed to public investors.
>
> • Confirmation from former customers and partners that the Company is likely a fraud. After visiting one of ABAT's plants, one customer called the facility "absolutely the biggest joke I'd ever seen". A recording of the conversation is available here. In another conversation available here and here, a customer said the CEO admitted to hiring an accounting firm "to cook his stock price up".

• Low quality auditors and high turnover. The Company has had 4 auditors in the past 7 years, with no auditor being ranked in the top global 100 auditors at the time of hire.

• Unqualified CFOs and high turnover. A CFO or auditor has resigned at least once a year. The Company's past three CFOs have included: (i) a company insider who has been general manager of the Company's main operating subsidiary since 2004, and is therefore not remotely independent, (ii) a 29-year-old who was formerly VP Finance at China Natural Gas, another fraud, and (iii) a candidate whose primary experience comprised of being a financial adviser at Smith Barney.

• Continuous share dilution through secondary offerings, despite having more than adequate cash reserves. Through repeated share issuances, the Company has grown its outstanding shares from 10.0 million following the 2004 reverse merger to 76.4 million today.

Our estimated fundamental value for ABAT is $0.00.  (See exhibit 5 attached hereto).

91.     The May 5, 2011 Prescience Investment Group research report is attached hereto as Exhibit 5.

92.     Defendants' breached their fiduciary duty by causing the Company to issue materially false and misleading statements and omit material facts, resulting in a loss of significant Company value and exposing ABAT to federal securities violations.  As a result of Defendants' wrongful acts and omissions, Company is now exposed to millions of dollars in defense costs and potential liability.

## DEFENDANTS' DUTIES

93.     By reason of their positions as directors and officers of the Company, and because of their ability to control the business, corporate, and financial affairs of the Company, the Defendants owed the Company the duty to exercise oversight, due care and diligence in the management and administration of the affairs of the Company, including ensuring that the Company operated in compliance with all applicable federal and state laws, rules and

regulations. To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and corporate affairs of the Company. By virtue of these duties, Defendants were required, *inter alia*, to:

      a. Manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with laws, rules and regulations, and the charter and by-laws of the Company;

      b. Ensure that the Company did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations and to become and remain informed as to how the Company was, in fact, operating;

      c. Remain informed as to how the Company was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including, but not limited to, maintaining and implementing adequate operational controls;

      d. Preserve and enhance the Company's reputation as befits a public corporation;

      e. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner; and

      f. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

94. Defendants, because of their positions of control and authority as directors and/or officers of ABAT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with ABAT, each of the Defendants had knowledge of material non-public information regarding the Company.

95. To discharge their duties, the officers and directors of ABAT were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of ABAT were required to, among other things:

     a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

     b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

     c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

96.     Pursuant to the Company's Employee Code of Business Conduct and Ethics (the "Code of Conduct"), each of the Defendants was required to be "in full compliance with all applicable laws, rules and regulations" affecting the Company. Additionally, the Code of Conduct provides that "protecting Company assets against loss, theft or other misuse is the responsibility of every employee, officer and director."

97.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee is responsible for oversight, on behalf of the Board of Directors, of:

- The Company's auditing, accounting and financial reporting processes, and the integrity of its financial statements;

- The audits of the Company's financial statements and the appointment, compensation, qualifications, independence and performance of the Company's auditor and independent registered public accounting firm;

- The Company's compliance with legal and regulatory requirements; and

- The staffing and ongoing operation of the Company's internal audit function.

98.     The conduct of the Defendants complained of herein involves a breach of their obligations as directors and officers of ABAT, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders and a breach of their fiduciary duty of loyalty, good faith, oversight, and diligence in management and administration of its affairs that the Defendants were aware posed a risk of serious injury to the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of ABAT to redress the breaches of fiduciary duty and other violations of law by Defendants.

100.     Plaintiff will adequately and fairly represent the interests of ABAT and its shareholders in enforcing and prosecuting its rights.

101.     The Board currently consists of the following eight (8) individuals: defendants Fu, Gao, Si, Bai, McFadden, Li, Xia, Yang, Patti, and Xue.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

102.     Each of these directors has been named as a defendant in this action and was a director during the time period when ABAT engaged in the improper conduct alleged herein.

103.     Defendants owed a duty to ABAT and its shareholders to be reasonably informed about the business and operations of the Company.  The Defendants completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

104.     Defendants owe ABAT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and

preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, Defendants had a duty to promptly and timely disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

105.   Plaintiff did not make a demand on the ABAT Board prior to instituting this action because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of their fiduciary duties, including the duty to exercise oversight, due care, and diligence.

106.   These acts, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

107.   Demand is excused because a demand would be a futile, wasteful and useless act as federal securities class action complaint has been filed against the Defendants for violations of §11 of the Securities Act, 15 U.S.C. §77k, on behalf ABAT shareholders that purchased or otherwise acquired ABAT shares between March 16, 2009 through and including March 29, 2011.  Each of the Defendants (other than Xue, who is not named in any of the §11 federal actions) is interested because he is a defendant in the pending securities class action suits arising out of the same facts relating to the breaches of fiduciary duty alleged herein, and faces significant personal liability for the wrongdoing alleged in the complaint.  Demand is therefore futile.

108.   Demand is also excused because a demand would be a futile, wasteful and useless act as every member of the Board permitted false and misleading statements to be made in SEC filings, thereby abdicating their fiduciary duties to the Company, and severely damaging the

Company.  Therefore, every member of the Board faces a substantial likelihood of liability for their breaches of fiduciary duties.

109.    Demand is excused because a demand would be a futile, wasteful and useless act as defendants issued a series of materially false and/or misleading statements in which they failed to disclose, among other things: (a) that Defendant Fu appears to have transferred ownership of ABAT's key subsidiary to himself without explanation to the Company's shareholders or compensation paid to the Company; (b) that ABAT makes cutting-edge electric cars, when in fact it produces cheap scooters and bicycles; (c) that ABAT increased revenue from $4.2 million to $97.1 million from 2005 to 2010 while decreasing its employee count; (d) that ABAT has certain distribution relationships which appear to be fake; (e) that ABAT spent $20 million to acquire a company linked to defendant Fu without disclosing the relationship; and (f) ABAT issued 11 million shares to defendant Fu and other individuals to repay a "loan" which was fabricated.

110.    Demand is excused because a demand would be a futile, wasteful and useless act as to defendants McFadden, Xue, Patti, and Hao, as each served as members of the Audit Committee and breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's press releases and other disclosures and failed to ensure that adequate internal controls were in place.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

34

112.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that ABAT disseminated accurate, truthful and complete information to its shareholders.

113.    Each of the Defendants also had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

114.    Defendants owed and owe ABAT fiduciary obligations. By reason of their fiduciary relationships, Defendants specifically owed and owe ABAT the highest obligation of good faith, fair dealing, loyalty and due care.

115.    Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by causing or allowing the Company to disseminate to ABAT shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.

116.    Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by failing to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

117.    Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by willfully ignoring the obvious and pervasive problems

with ABAT's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

118.    Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by abandoning and abdicating their responsibilities and duties with regard to prudently managing the businesses of ABAT in a manner consistent with the duties imposed upon them by law.

119.    These actions could not have been a good faith exercise of prudent business judgment.

120.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of ABAT.

123.    Plaintiff, as a shareholder and representative of ABAT, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing ABAT to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.     Awarding to ABAT restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: June 28, 2011

LEVI & KORSINSKY, LLP

By: _____

Shannon L. Hopkins
Todd Garber
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

***Attorneys for Plaintiff***