Case 1:11-cv-04383-CM-DCF   Document 66   Filed 06/19/15   Page 1 of 44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                    :

CARL BRAUN, derivatively on behalf of
ADVANCED BATTERY TECHNOLOGIES, INC.,      :      11cv04383 (CM) (DF)

             Plaintiff,      :      **REPORT AND**
                                 **RECOMMENDATION**

            -against-      :

ZHIGUO FU, GUOHUA WAN, GUOPENG GAO,    .  :
HONGJUN SI, LIQUI BAI, JOHN MCFADDEN,
YULIN HAO, NING LI, SHAOQIN XIA,
SHIYAN YANG, COSIMO J. PATTI, and CHI
YUAN XUE,

            Defendants,

and,

ADVANCED BATTERY TECHNOLOGIES,
INC.,

            Nominal Defendant.
-----------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 7|10|15

**MEMO ENDORSED**

## TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:

Three-and-a-half years into this litigation, counsel informed the Honorable

Colleen McMahon that Carl Braun ("Braun"), the plaintiff in this shareholder derivative suit, had

sold his shares in the nominal defendant company, Advanced Battery Technologies, Inc.

("ABAT"), prior to the date the suit was filed, and that he had thus lacked standing to commence

the action in the first place. Upon learning this (and after having earlier rejected a proposed

settlement agreement as an apparent sham), Judge McMahon referred the matter to this Court for

a sanctions hearing. (*See* Dkts. 40, 41.) On April 7, 2015, this Court held an evidentiary

hearing, at which it took testimony from both Braun and his litigation counsel, as well as

7/10/2015 I have reviewed the Report of the learned Magistrate Judge and the Objection thereto that was faxed yesterday by Objector Joel Caplan. I accept the Report, overrule the objection, adopt the Report as the Court's opinion (correcting page 43 by striking the word "Braun's motion" and substituting "Caplan's motion") and — with regret, but of necessity — I decline to award sanctions against

(*Handwritten side note, right margin:*) Braun or limit Kransky from Mr. Caplan's further motion of Colla. I will [illegible] Oths, CATS E. (new refusal Phase)

ABAT's counsel, regarding the circumstances in which this case came to be commenced and continued.

As a result of that hearing, and as set out in greater detail below, this Court concludes that Braun's counsel, the firm of Levi & Korsinsky ("L&K"), suffered from seriously deficient internal practices and procedures with respect to case initiation, client communication, and case management. Certainly, the litigation partner handling this matter – and the firm by extension – exhibited gross negligence in allowing this action to have been filed and prosecuted based on the false premise, stated in the Complaint but apparently never checked, that Braun was an ABAT shareholder at the time of suit. Indeed, the evidence suggests that counsel barely, if ever, spoke to Braun, much less engaged in anything resembling diligent inquiry regarding the facts. It also appears that counsel failed to explain to Braun the nature of this action and his obligations as a plaintiff. This failure by counsel was so extreme that Braun testified, without contest by counsel, that, *up until the very day of the hearing before this Court*, he was of the mistaken impression that he was a plaintiff in a securities class action (the purpose for which he initially approached counsel, in response to a solicitation), and not a derivative suit; that, until that very day, he had never actually seen the Complaint that counsel filed on his behalf; and that he had never been informed that he needed to retain his shares in ABAT. This is not to say that Braun, himself, is without any fault here. On the stand, he conceded that he had signed a verification, confirming, under penalty of perjury, the correctness of the statements contained in the Complaint, even though he testified that no copy of the Complaint had been sent to him for review. His excuses that he trusted counsel, that he thought he was only one plaintiff of many in a class-action suit, and that he believed his signing of the verification was merely an "administrative" matter, cannot justify perjury.

2

Nonetheless, as troubling as the conduct by both counsel and client has been, this Court cannot conclude that either acted with the subjective bad faith that, in the case's present posture, would be necessary for the Court to impose sanctions, whether under Rule 11(c) of the Federal Rules of Civil Procedure, pursuant to Section 28 U.S.C. § 1927, or in the exercise of the Court's inherent authority. This is a situation where the Court itself has initiated the sanctions inquiry after dismissal of the Complaint, and the Second Circuit has made clear that, in such a circumstance, even objectively unreasonable behavior is an insufficient basis for sanctions. In fact, even an incidence of perjury, without more, is not enough to satisfy the stringent standards for when sanctions may be imposed; there must be evidence that the attorney or client knew that a pleading or position being advanced was frivolous; that the party's claims or positions were being pursued for an improper purpose; or that the attorney or client was engaged in a deliberate or unconscionable scheme to interfere with the Court's ability to adjudicate a case fairly. As discussed further below, the conduct at issue here, while terribly neglectful, irresponsible, and hugely wasteful of the Court's resources, does not rise to that level. Accordingly, and despite the fact that the conduct of both L&K and Braun is deserving of reprimand, I recommend that the Court refrain from imposing sanctions.

In addition, I recommend that the Court deny the post-hearing motion filed *pro se* by non-party Joel Caplan ("Caplan"). (Dkt. 54.) By that motion, Caplan – an ABAT shareholder who had objected to the parties' proposed settlement – has requested that any sanctions levied against L&K or Braun include a payment to him, constituting an "incentive award, costs, fees, and attorney's consultations," for his role in "providing value to the Court." (*Id.*) Regardless of whether, under any circumstances, the Court would have the authority to grant such an award to

3

a non-party, there is, in any event, no basis to consider Caplan's request here, absent an
underlying basis for sanctions.

## I.     SANCTIONS AGAINST BRAUN AND/OR HIS COUNSEL

### A.     Factual Background

Unless otherwise stated, the facts set forth herein are taken from the testimony given at
the April 7, 2015 hearing before this Court and from post-hearing submissions made by the
parties.

#### 1.     Braun's Initial Contact With L&K, Regarding His
Potential Role as a Plaintiff in a Securities Class Action

According to Shannon L. Hopkins, Esq. ("Hopkins"), L&K partner and counsel of record
on this case (*see* Dkt.; *see also* Affidavit of Shannon L. Hopkins in Support of Plaintiff Carl
Braun and His Counsel, Levi & Korsinsky LLP's, Response to Order To Show Cause, sworn to
Apr. 14, 2015 ("Hopkins Aff.") (Dkt. 53), ¶ 1), Braun first approached L&K at the beginning of
April 2011, by sending the firm an email in response to a March 31, 2011 press release by the
firm, announcing that it was investigating potential claims against ABAT, and inviting
stockholders to contact the firm (*see* Transcript of Hearing, dated Apr. 7, 2015 ("Tr.") (Dkt. 59),
at 16:14-17:4; *id.*, at 15:9-14; *see also* Hopkins Aff. ¶ 4 and Exs. 1 (Email String), 2 (Press
Release) (Dkts. 53-1, 53-2)).

Hopkins testified that an attorney at the firm, Cecile Cargil, Esq. ("Cargil") was charged
with client "intake." (Tr., at 9:25-10:20.) Hopkins further testified that, for "efficiency
purposes," it was L&K's practice, apparently through Cargil, to send a potential class-action
plaintiff a retainer agreement, and, at the same time, ask for confirmation regarding the
ownership of shares. (*See id.*, at 17:15-18.) Here, the evidence shows that Cargil sent Braun an
email on April 4, 2011, enclosing a proposed retainer agreement and stating, in pertinent part:

4

> Dear Carl:
>
> Thank you for your submission.
>
> We are prepared to proceed with the class action suit against Advanced Battery Technologies, Inc (ABAT) for violations of the Securities Exchange Act.
>
> . . . . Because a shareholder class action is vital to the protection of shareholders' interests, I encourage your participation. To participate in the class action, please send (via email or fax . . .) a signed copy of the attached retainer agreement along with an account statement showing your ABAT shares.

(Hopkins Aff., Ex. 1 (Email from Cargil to Braun, dated Apr. 4, 2011).) The retainer agreement

that Cargil sent to Braun provided:

> This letter confirms that you have retained Levi & Korsinsky, LLP to represent you as a named plaintiff in the class action against Advanced Battery Technologies, Inc (ABAT). As a named plaintiff, you acknowledge that you owned or purchased shares of ABAT prior to March 30, 2011.

(*Id.* (Retainer Agreement).)

An email string produced by L&K suggests that Braun signed and returned this retainer

agreement on April 5, 2011, indicating, in a space provided in the signature block, that he owned

1500 shares of ABAT stock. (*See id.*) This copy of the retainer agreement, however – the only

copy that L&K located in its files – did not contain the signature of any L&K attorney. (*See id.*)[1]

Moreover, despite Cargil's request that Braun supply an account statement, Hopkins was unable

to confirm that Braun had done so:

> COURT: Was [Cargil] responsible for getting any kind of documentation regarding the ownership of shares?
>
> HOPKINS: Account statements, yes; she would do that as well.

---

[1] Hopkins testified that Joseph Levi, Esq., a named partner in the firm, "would have [been the one to have] signed it," but that she did not have a copy of a fully executed retainer. (Tr. 15:19-24.)

5

COURT:      In this case did she obtain an account statement from
            Mr. Braun?

HOPKINS:    I was not able to find one on our server, your Honor.

COURT:      So it may be that none was ever obtained?

HOPKINS:    It is possible. I just have not been able to find one. I have
            asked e-mail searches to be done and things like that and I
            am unable to find one.

                         . . .

HOPKINS:    I want to say it is our practice to make sure that there is an
            account statement in-hand verifying ownership before
            anything gets filed.

COURT:      So it is your practice but you actually don't know it is was
            done in this instance?

HOPKINS:    Correct.

(*Id.*, at 13:2-20.)

### 2.   L&K's Decision To Proceed With a
         Shareholder Derivative Suit, and Its Lack of
         Communication With Braun, Regarding This Decision

In April and May of 2011, other law firms filed securities-fraud class actions against

ABAT, and those cases, consolidated before Judge McMahon, had a deadline of May 31, 2011

for motions to appoint lead plaintiffs. *See In re Advanced Battery Technologies, Inc. Securities

Litigation*, Consolidated Civil Action No. 11cv02279 ("*In re ABAT*"); *see also* Hopkins Aff. ¶ 8.

By May 31, 2011, L&K determined that none of the shareholders who had made submissions to

the firm – including Braun – had suffered a "sufficiently large loss[]" to be able to serve as an

adequate named plaintiff. (*Id.* ¶ 9; *see also* Tr., at 14:17-20 (Hopkins testifying that "when we

received Mr. Braun's submission he had 1,500 shares and we realized that that was not

something that we could move for lead plaintiff with, it is just too small").) As a result, L&K

6

decided, instead, to pursue potential derivative claims against ABAT. (Hopkins Aff. ¶ 10; *see also* Tr., at 14:20-21.)

It is unclear who, at L&K, actually decided that Braun would be an appropriate plaintiff for a derivative suit, and, indeed, the evidence suggests that *no one* at the firm ever consulted with Braun, before deciding to proceed in this vein with him. Surely, it seems that no separate retainer agreement was ever prepared for Braun to confirm the firm's representation of him in a derivative suit; the firm apparently had no record in their files of any such retainer being sent to Braun or signed by him. (*See* Tr., at 15:15-16 ("COURT: Was there ever a new retainer agreement?" HOPKINS: "Not that I was able to find, your Honor."); *see also id.*, at 18:2-6 (COURT: "But here the retainer agreement was for a securities case and there was never one prepared with respect to the derivative action." HOPKINS: "Right; and so what I . . . think happened here is that it was a breakdown of our process.").)

Moreover, it appears that no one at the firm explained to Braun that, in order to be a plaintiff in a derivative action, he would need to hold his shares. While Hopkins asserted that it was L&K's practice "for one of the litigation attorneys assigned to the case to contact the client to ensure that the client understands, among other things, the nature of the case, his or her responsibilities and the allegations in the complaint" (Hopkins Aff. ¶ 14), Hopkins was unable to provide any evidence that even a single contact had been made with Braun to discuss with him the nature of a derivative suit and his attendant obligations as a plaintiff in such a suit. Hopkins, who, once the decision was made to proceed with a derivative suit, was assigned to be the litigation partner on the engagement (*id.* ¶ 11; *see also* Tr., at 19:9-12), acknowledged that she, herself, should have had such a conversation with Braun, but she apparently assumed – incorrectly – that one of her colleagues had already done this:

7

COURT:   So who would have been the person, if anyone, who would
         have had an initial conversation with the client to say if we
         are going to proceed with a derivative action you have to
         hold your shares?

HOPKINS: In a normal situation that should have been me and, again, I
         take full responsibility. . . . I thought that had already been
         done . . . when I had been handed the case and it hadn't.

(Tr., at 20:5-9.)

Hopkins summarized the matter as follows:

> [When] [t]he decision was made to go over to a derivative case
> instead [of a class action], we didn't get a different retainer
> agreement, we just had the one retainer agreement and it wasn't
> made clear to Mr. Braun when we changed over to the new type of
> case that he needed to hold his shares because [in] the original type
> of case he didn't need to hold his shares. And we take full
> responsibility for that. We didn't explain to him that in this type of
> case you need to hold your shares.

(*Id.*, at 18:7-14.)

### 3.   **Role of Garber, in Preparing and Signing the Complaint**

The associate attorney who was assigned to work with Hopkins, and to draft a derivative

complaint, was Todd S. Garber, Esq. ("Garber"), who had approximately seven to eight years of

experience at the time. (*See* Hopkins Aff. ¶ 11; *see also* Declaration of Todd S. Garber in

Response to Show-Cause Order, dated Apr. 14, 2014 ("Garber Decl.") (Dkt. 49), ¶ 6.) Garber

did not join L&K as an associate until about a month after Braun had retained the firm, and he

was then associated with the firm for only a short period of time, from May to August 2011.

(Garber Decl. ¶ 3; *see also* Tr., at 43:13-15.)[2]

---

[2] Garber left L&K on or about August 11, 2011, and withdrew from this case at that time.
(Garber Decl. ¶ 11; Dkt. 6.) He is now a member of the firm of Finkelstein, Blankinship,
Frei-Pearson & Garber, LLP. (Garber Decl. ¶ 11.) When this Court learned that Garber was no
longer at L&K and that L&K had not reached out to him to ask that he be present at the April 7,

It appears that, sometime in June of 2011 (after the May 31, 2011 deadline for moving to
add lead plaintiffs in the securities class action had passed), Garber drafted a derivative
complaint that named Braun as the plaintiff. In drafting this pleading, Garber did not meet with
Braun or have any discussions with him. (Garber Decl. ¶ 9.) According to Garber, it was not his
responsibility to communicate directly with the client; rather, others at the firm, including Cargil
(and presumably Hopkins), were tasked with such responsibility. (*Id.* ¶ 8.) Thus, when he
prepared the Complaint, Garber relied on information contained in L&K's files (*id.* ¶ 6),
apparently including Braun's representation in the retainer agreement that he owned 1500 shares
of ABAT stock (*see id.*; *see also* Hopkins Aff. Ex. 1). The Complaint, in its final form, and
presumably as initially drafted by Garber, stated: "Plaintiff . . . is a current shareholder of ABAT
and has held ABAT stock during the Relevant Period and continues to hold today." (Verified
Shareholder Derivative Complaint, dated June 28, 2011 ("Compl.") (Dkt. 1), ¶ 13.)

On or about June 23, 2011, Braun signed and returned to the firm a verification, stating:
"I, Carl Edward Braun, under penalties of perjury, hereby do declare that I am a plaintiff in the
foregoing compliant [sic], that I have read the complaint, and that the facts therein are true to my
own knowledge . . . ." (*See* Compl. (Verification[3]); *see also* Tr., at 43:25-44:3.) Garber was not

---

2015 hearing, this Court, on short notice, itself requested his appearance, and he honored that
request. (*See* Tr., at 3:6-12.)

   [3] The version of the Complaint that was scanned into the Court's electronic docket
(Dkt. 1) does not include Braun's signed verification. At the hearing, Garber pointed out that the
Complaint would have been filed before the Court's electronic case filing ("ECF") system was in
place (Tr. 41:25 - 42:1), leading this Court to search for and locate the file containing a hard
copy of the Complaint, as actually filed. That copy did have an attached verification. As stated
by this Court:

> I am going to note for the record that my deputy has just gone to
> the file room to pull the original complaint from the file given the
> fact that Mr. Garber is quite right, these were not electronically
> filed at that time. So, we have the original complaint now . . . and

9

the person who sent the verification to Braun for signature; he thought Cargil likely sent it. (See

Tr., at 42:18-43:12.) Garber, however, was apparently provided with a copy of the signed

verification when it was returned, which let him to believe that that the draft Complaint had been

sent to Braun, as well, and that Braun had confirmed the accuracy of the facts as to which he had

personal knowledge. (See Tr., at 43:25-44:2 ("I would have drafted the complaint based on what

was in the file and then based on the verification, so then I have a verification saying that it is all

good.").) On June 23 – the same date as is shown on the verification – Garber received Braun's

contact information from Cargil, by email, and forwarded it to Hopkins, with a note that

referenced the status of the pending securities class action, and which stated: "We got an

American Battery client." (Hopkins Aff., Ex. 3.)

According to Garber, he signed the Complaint as counsel only after he had seen Braun's

verification and had sent the Complaint to Hopkins for review. (Garber Decl. ¶¶ 7, 11; Tr., at

44:1-18.) Hopkins confirmed that Garber provided her with a draft of the Complaint for review,

before it was filed. (See Hopkins Aff. ¶ 18; Tr., at 15:1.) According to Hopkins, she consented

to the filing of the Complaint, without substantive changes, in reliance on Garber's

"representation that the client had signed off on [it]." (Hopkins Aff. ¶ 18.) The Complaint was

signed by Garber, and filed, on June 28, 2011. (See Dkt. 1.)

---

then attached to it just before the exhibits are not one but two
copies of a verification by Mr. Braun. So, when the document got
scanned and put on ECF, the verification was somehow left off but
it does exist in the original.

(Tr. 50:13-18, 51:2-5.)

### 4.   Braun's Signing of the Verification

When Braun took the stand at the hearing before his Court,[4] he testified that, contrary to

what was stated in the Complaint, he sold his shares in ABAT on April 7, 2011, two days after

signing the class-action retainer agreement with L&K.[5] (Tr., at 58:18-59:1.) He explained that

he sold his shares so as to "recoup whatever [he] could because the stock kept going down."

(Tr., at 59:4-6.) Braun testified that he did not discuss his decision to sell his shares with L&K

because he "wasn't aware that [he] wasn't supposed to sell the shares." *Id.* Braun further

testified: "I didn't think it mattered because I thought I was just part of a class action suit and I

didn't know that I shouldn't sell the stock." (*Id.*, at 61:11-13.)

Braun also confirmed that he had signed a verification stating that the facts set out in the

Complaint were true, but testified that he had done so without actually seeing a copy of the

Complaint, and that he was unaware that the Complaint falsely stated that he was a "current

shareholder" in ABAT. (*Id.* at 65:3-7 (COURT: "[A]m I correct in understanding that when you

signed the verification of the complaint you had no idea that the complaint contained a statement

that you were a current shareholder in ABAT?" BRAUN: "That's correct."); Compl. ¶ 13.)

Braun testified that he understood that, when signing the verification, he was doing so

under penalty of perjury, and he understood what that meant. (Tr., at 65:13-18.) He testified,

---

[4] At the hearing, this Court informed Braun, that, if he wished, it would give him the
opportunity to retain separate counsel to represent him in connection with the sanctions
proceeding, in order to avoid any potential conflict of interest between him and L&K. (Tr.,
at 48:14-25 – 49:1-25.) Braun declined, and stated that he wished to go forward and to testify.
(*Id.*)

[5] According to Hopkins, in August 2014, when she finally asked Braun about his stock
ownership, Braun told her that he had sold his shares about a year earlier. (Hopkins Decl. ¶ 33.)
When he testified, Braun did not deny this conversation, but he noted that he had not checked his
records at the time (*see* Tr., at 27:23-28:19), and his account statement confirmed that the sale
was actually on April 7, 2011 (Hopkins Decl., Ex. 8).

however, that he thought the verification was an "administrative" document (*see id.*, at 65:10-12

("I signed it on the fact that the lawyers sent me an administrative document to sign and I

assumed that they were crossing their Ts and dotting their Is.")), that he was one of "thousands"

of class-action plaintiffs (*id.*, at 52:19-20), and that he signed the document based on his "trust"

in his attorneys (*see id.*).

Specifically, Braun testified as follows:

> COURT:    You don't recall seeing the full complaint?
>
> BRAUN:    Correct.
>
> COURT:    So, with the verification that says that 'I have read the complaint,' do you remember reading something?
>
> BRAUN:    No. I remember reading a letter asking that I sign the document.
>
> COURT:    The verification?
>
> BRAUN:    Yes, ma'am.
>
> COURT:    And you don't remember a complaint going along with it?
>
> BRAUN:    I don't.
>
> COURT:    So, can you explain to me in your own words why you would have signed something that says that you have read the complaint and the facts therein are true, without reading a complaint?
>
> BRAUN:    I can't. It was trust. I thought this was an SEC action and I was one of thousands that was involved in it.
>
> COURT:    You did not have an understanding that you were going to be the named plaintiff in a shareholder derivative action?
>
> BRAUN:    No, ma'am.
>
> COURT:    When did you first learn that?
>
> BRAUN:    Today.

> COURT:  Today is the first day that you learned that you were the
> plaintiff in this case?
>
> BRAUN:  Yes, ma'am.
>
> COURT:  When was the first time that you saw the full complaint?
>
> BRAUN:  Today.

(Tr. 52:5-53:5.)

Hopkins did not directly contradict Braun's testimony that he had never been sent a draft

of the Complaint before this action was commenced (or a final version at any time thereafter),

and provided no evidence to cast doubt on that testimony. Hopkins stated that, based on the

firm's "standard practice," Cargil, as "the intake attorney at L[&]K, would have sent the draft

complaint to Braun upon the request of one of the litigation attorneys, along with a derivative

verification for Braun to sign." (Hopkins Aff. ¶ 13; *see also* Tr., at 11:21-12:19 (Hopkins

testifying that it was Cargil's job to send a complaint to a client for review, together with a

verification).) Hopkins further testified that, prior the hearing, she had spoken with Cargil, who

believed that she *had* sent a copy of the draft pleading to Braun by email, together with the

verification (*id.*, at 45:9-46:5). Cargil, however, did not appear at the hearing, and Hopkins'

hearsay testimony on this point was not corroborated by any contemporaneous email or other

documentation. In fact, Hopkins testified that she was unable to locate any email showing that

the draft Complaint had been provided to Braun (*id.*, at 45:16-21),[6] and confirmed after the

---

[6] Although Hopkins claimed that the firm had been on a different email system at the
time, and that the emails were not backed up (Tr., at 45:18-21), Hopkins did not explain how
other emails from the same time period – including Cargil's initial email to Braun on April 4,
2011, by which Cargil sent Braun the class-action retainer agreement, and Garber's email to
Hopkins on June 23, 2011, in which Garber informed Hopkins that the firm had "got[ten] an
American Battery client" (Hopkins Decl., Ex. 3) – were capable of retrieval.

hearing that L&K had no "specific documentation demonstrating that the draft complaint was sent to Braun" (Hopkins Aff. ¶ 16).

### 5. Prosecution of the Action by Hopkins, as the L&K Partner on the Case

As set out above, Hopkins conceded at the hearing that she should have had an initial discussion with Braun in connection with any decision to have him assert derivative claims against ABAT, and that she had failed to do so. Operating under the flawed assumption that another attorney at the firm had already confirmed Braun's stock ownership and had counseled him regarding the need to retain his shares for the duration of the suit, and believing that she had no continuing obligation to keep checking to confirm that Braun was heeding what she assumed were previously-given instructions, Hopkins also failed to make further inquiries of Braun on this topic, before approving the Complaint for filing:

> COURT:     And I gather you didn't do anything to satisfy
>            yourself that he in fact still owned shares at the time
>            that he signed the verification?
>
> HOPKINS:   I personally did not do that. I don't believe that
>            plaintiff's counsel is under a continuing requirement
>            to keep updating themselves once we got the initial
>            account statement verifying ownership. That's
>            obviously assuming the proper discussions were
>            had, the client knows to hold the shares and things
>            like that.

(Tr., at 24:15-23.)

It appears that Hopkins also did little to communicate with her client or to prosecute this action, once it was commenced. Initially, the lack of activity in this action was the result of strategic decisions by counsel, in light of (a) the pending securities class action before the Court (*In re ABAT*), and (b) a parallel derivative suit that had been filed against ABAT in the state court, on behalf of a plaintiff named Anthony Blumka ("Blumka") (*Blumka v. Fu, et al.*, Index

14

No. 651343/2011 (Sup. Ct. N.Y. County)). (*See* Hopkins Aff. ¶ 20.) According to Hopkins,

L&K and counsel for Blumka agreed to coordinate efforts to prosecute the derivative claims.

(*Id.* ¶ 21.) Also, purportedly "to conserve judicial resources," L&K agreed in July 2011 (a

month after this action was filed) to stay the case pending the resolution of a motion to dismiss

that was anticipated to be filed in the securities action. (*Id.* ¶ 22; *see* Dkt. 5 (Stipulation and

Order, staying proceedings in this action).)

As to these initial strategy decisions, however, the record reflects that Hopkins left Braun

uninformed. At the hearing before this Court, Braun testified that he did not learn of the

existence of the *Blumka* case until the date of the hearing (Tr., at 53:16-20); he also testified that

he had not known of the pendency of a securities class action that was separate and apart from

his own case (*see id.*, at 53:9-12 (COURT: "Were you aware at any time that there was another

lawsuit pending that was a securities class action separate from your suit?" BRAUN: "I thought

that's what I was involved in.")). For the most part, Hopkins did not dispute Braun's testimony

regarding her lack of communication with him, and certainly did not dispute that she had failed

to get in touch with him during the initial stage of the case. (*See id.* at 55:23-56:15 (Hopkins

conceding that she did not initially communicate with Braun regarding the fact that other actions

were pending, or that discovery in this action had been stayed).)

The motion to dismiss the securities action was decided by the Court on August 29, 2012.

(*See* Dkt. 90, in *In re ABAT*.) Based on the terms of the Stipulation and Order entered in this

action (Dkt. 5), the stay of these proceedings was lifted 30 days thereafter, *i.e.*, on September 28,

2012. It appears, however, that the parties did not then commence discovery.[7] Nor does it

---

[7] ABAT has submitted certain attorney time records to this Court, in connection with
Judge McMahon's direction that this Court consider whether certain of ABAT's attorneys' fees
should be awarded as part of any sanctions against Braun and/or L&K. (*See* Dkt. 40.) These

appear that Hopkins then had any consultation with her client regarding any need to prosecute

this action.  Rather Hopkins has merely informed this Court that, at some time in "late 2012,"

plaintiffs Braun and Blumka "were invited to participate in potential settlement discussions with

[ABAT]."  (Hopkins Aff. ¶ 23.)

   It seems that, at some point, Hopkins proceeded to engage in settlement discussions, but

failed to inform Braun of this development.  At most, Hopkins was able to produce a single

email to Braun, dated May 1, 2013 (in other words, several months after settlement negotiations

had supposedly begun), in which she informed her client of the terms of a tentative settlement

agreement, and asked him to "confirm [his] consent to proceed with a settlement" on the outlined

terms.  (Hopkins Aff., Ex. 4 (Email to Braun from Hopkins, dated May 1, 2013[8]); *see also id.*

¶ 26.)  According to Hopkins, when she did not receive a response from Braun, she called him

two days later, on May 3, 2013, and secured his consent to proceed with a settlement "based on

the parameters discussed in [her] prior email."  (*Id.* ¶ 27.)  While Hopkins further attested that,

"over the course of the following months, the parties negotiated a settlement" (*id.* ¶ 28), she has

offered this Court nothing to show that she, or anyone at L&K, had any further contact with

Braun regarding those negotiations, even up to the date when a proposed final settlement was

submitted to the Court.

   On October 16, 2013 – more than a *year* past the date when the stay of proceedings in

this action was lifted (without any discovery having taken place during that year), and more than

_____

records (Dkts. 45, 47) do not reflect that *any time whatsoever* was spent by counsel in discovery
in this action (*see id.*).

   [8] The copy of this email that has been submitted to this Court has been redacted to omit
the actual terms of the proposed settlement, but it is clear from context that the email set out such
terms.  (*See id.*)

five months past the date when Hopkins described having had a single conversation with Braun –
the parties to this action filed a joint motion seeking preliminary approval of a proposed
settlement agreement of both this action and the *Blumka* case. (Dkt. 9; *see also* Dkt. 11-1
(Proposed Agreement).)  Five months of proceedings relating to the proposed settlement then
followed before the Court, including fairness hearings conducted on December 13, 2013 and
February 21, 2013. (*See generally* Dkt.)  When, on March 18, 2014, the Court disapproved the
settlement, finding that it failed to require ABAT to enter into compliance with U.S. law
(Dkt. 23; *see also* Dkt. 40 (referring to ABAT's "sham" obligations under the proposed
settlement)), the parties, once again, apparently failed to engage in discovery.  (*See supra* at n.7.)

According to Hopkins, she did call Braun on March 19, 2014 to inform him that the
Court had denied approval of the settlement, but, in that call, she claims to have "recommended
waiting to receive the Court's opinion on the settlement in the Securities Fraud Action before
deciding the strategy going forward."[9]  (Hopkins Aff. ¶ 29.)  Although Hopkins contends that
she then engaged in strategy discussions with Blumka's counsel, and although the Court entered
an order granting final approval of the class-action settlement on May 19, 2014 (*see* Dkt. 144, in
*In re ABAT*), Hopkins apparently had no further contact with Braun until August 21, 2014.
(Hopkins Aff. ¶ 32.)  It was at that point that Hopkins finally asked Braun to confirm that he still
owned ABAT shares. (*Id.*)

At the hearing, this Court questioned Hopkins about her decision to wait as long as she
did to seek confirmation of Braun's continued stock ownership:

> COURT:  Well, you submitted a motion for preliminary approval for
> settlement in October 2013?

---

[9] This Court notes that this quoted statement by Hopkins appears to reveal legal advice
that may be subject to privilege, but, in the context of this Report and Recommendation, this
Court will decline to enter into any analysis of privilege or of potential waiver.

HOPKINS:   Yes.

COURT:   You didn't see any reason to confirm with him at that time that he still owned shares?

HOPKINS:   You know, in hindsight, that probably would have been the right thing to do. Again, I assumed that he would tell me if he . . . didn't have his shares anymore . . . .

COURT:   What made you no longer assume that in August 2014 if you were operating under this assumption all along? Was there something that triggered in your mind that you should ask him this question in August 201[4]?

HOPKINS:   Well, it had been, you know three or – it had been quite some time since we initially filed the case and we were about to engage in potentially costly litigation at this point, The case went straight from being stayed to settlement mode. At that point in time we were getting – would have been gearing up to get into extremely costly discovery and motion practice, so before doing that we wanted to make sure –

COURT:   Why August, end of August 2014? The Court declined to approve the proposed settlement on March 18, so we are talking over five months after that. Why five months later, were you thinking about discovery and asking this question as opposed to right after the Court declined to approve the settlement?

HOPKINS:   Well, we were waiting to see what happened with the securities fraud settlement first which came out in May 2014, I think.

COURT:   So it is still three months after that.

HOPKINS:   Yeah. You know, again, we were coordinating with the state plaintiffs and I have e-mails going back and forth with the state plaintiffs over the summer trying to figure out what we thought would be the best course of action. And then, during those calls, it was brought up that we should all go back to our clients and confirm that they still have their shares. . . .

18

Case 1:11-cv-04383-CM-DCF   Document 66   Filed 06/19/15   Page 19 of 44

(Tr., at 28:4-29:13; *see also* Hopkins Aff. ¶ 31 ("On August 20, 2014, I and counsel for Blumka discussed, among other things, contacting our respective clients to confirm that they were still willing to prosecute the derivative actions and that they still had standing to pursue the matter.").)

It turns out that *both* Braun *and* Blumka had sold their shares in ABAT, seemingly independently. (Hopkins Aff. ¶¶ 32-33 (Hopkins stating that, on August 21, 2014, Braun informed her of his sale); *id.* ¶¶ 34-35 (Hopkins explaining that, on the same day, she contacted Blumka's counsel to inquire whether Blumka would be willing to substitute in as a new plaintiff in this action, and was informed that Blumka had also sold his shares); *see also* Tr., at 59:24-25 (Braun testifying that he did not know Blumka).) Thus, it became apparent to Hopkins, on Thursday, August 21, 2014, that the derivative suit before the Court could not proceed with Braun as plaintiff, and that Blumka could not take his place. On the following Tuesday, August 26, 2014, Hopkins sent an email to counsel for ABAT, Lee Shalov. Esq. ("Shalov"), of McLaughlin & Stern, LLP, asking if he was available for a call. (Hopkins Aff., Ex. 7.) Shalov asked if the call could wait until the following week, as he was on vacation, and Hopkins responded, "Yes, no rush. We wanted to discuss with you that both of our clients in the federal and state cases have apparently sold their shares so we will be dismissing both cases." (*Id.*) Shalov then suggested that Hopkins send him a proposed stipulation, and Hopkins agreed to do so. (*Id.*)

A week later, on September 2, 2014, Judge McMahon issued a Scheduling Order in this action, setting a November 2014 trial date, and noting that the Court had not received any communication from the parties and assumed they had been engaging in discovery. (Dkt. 25.) A week after that, the parties submitted a stipulation of dismissal of the action with prejudice.

(Dkt. 26.) Judge McMahon scheduled an in-person conference for the parties to explain the reason for dismissal. (Dkt. 27.) On October 24, 2014, the parties appeared before Judge McMahon, who stated that she found the stipulated dismissal to be "very odd." (Transcript of conference conducted Oct. 24, 2014 Conference ("Oct. Tr."), at 5:7-8 (Dkt. 60).) The Court directed Braun to file a motion for dismissal, and to include in that motion information "about when [he] disposed of his shares and under what circumstances." (*Id.* at 7:13-15, 7:19-22.)

On October 27, 2014 Hopkins contacted Braun to inquire – apparently for the first time – about the circumstances surrounding his sale of ABAT stock, and to request an account statement showing the date of the sale. (Hopkins Aff. ¶ 38.) On October 28, 2014, Hopkins received the account statement, which showed that Braun had sold his 1,500 shares of ABAT stock in a single transaction on April 7, 2011. (*Id.*, Ex. 8.)

On November 7, 2014, Hopkins filed a motion, on Braun's behalf, to dismiss the action based on Braun's sale of his ABAT shares. (Dkts. 34, 35.) On the same day, counsel for ABAT filed a response, stating that it did not oppose the motion, but further noting that the Court could consider whether "Defendants should be afforded costs and any other relief" in light of the fact that Braun had lacked standing to commence the action when it was filed. (Dkt. 36.)

The Court granted Braun's motion for dismissal on March 17, 2015 (Dkt. 39), and, the following day, issued an Order directing Braun and L&K to show cause, at a hearing before this Court, why sanctions should not be imposed against them "for their conduct in commencing, maintaining and discontinuing this lawsuit." (Dkt. 40.)

20

**B.**   **Appropriateness of Sanctions in This Case**

**1.**   **Applicable Legal Standards**

**a.**   **Rule 11**

Pursuant to Rule 11(b)(3) of the Federal Rules of Civil Procedure, an attorney who

presents a pleading to the court "whether by signing, filing, submitting, or later advocating it . . .

certifies that to the best of the person's knowledge, information, and belief, formed after an

inquiry reasonable under the circumstances . . . the factual contentions have evidentiary

support . . . ." Fed. R. Civ. P. 11(b)(3).  If the court determines that an attorney has violated

Rule 11(b)(3), then the court may, "after notice and an opportunity to respond," impose

sanctions. Fed. R. Civ. P. 11(c)(1).  Sanctions may be sought by a party on motion or,

alternatively, the court, on its own initiative, "may order an attorney, law firm, or party to show

cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ.

P. 11(c)(3); *see also, e.g.*, *Siegel v. Pro-Ex Sec.*, No. 02cv00610 (DLC), 2002 WL 1203851, at

*2 (S.D.N.Y. June 3, 2002).

Under Rule 11(c)(1), sanctions may be imposed not only against attorneys, but also

against represented parties, where the party "is responsible for the violation." Fed. R. Civ. P.

11(c)(1); *see S. Pac. Shipping Co. Inc. v. Redi-Fresh Produce Inc.*, No. 14cv04157 (LAK) (AJP),

2014 WL 6968039, at *11 (S.D.N.Y. Dec. 9, 2014) ("Sanctions frequently are assessed against

both represented parties and their attorneys when the Court finds the party has acted in bad faith,

or proceeded with an improper purpose.")  When sanctions are brought against an individual

attorney, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a

violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1).  When

assessing whether a Rule 11 violation has occurred, however, the court must resolve all doubts in

21

favor of the signer of the pleading. *See Carlton Group, Ltd. v. Tobin*, No. 02cv5065 (SAS), 2003 WL 21782650, at *2 (S.D.N.Y. July 31, 2003).

Because the language of Rule 11(c) states that a court *may* impose an appropriate sanction if the court determines that Rule 11(b) has been violated, an analysis of the Rule involves two issues: "(1) whether Rule 11 has been violated and (2) whether the court should exercise its discretion to award sanction[s] based on the violation." *Bernhardt v. Tradition N. Am.*, 676 F. Supp. 2d 301, 306 (S.D.N.Y. 2009). Thus, a "finding that Rule 11 has been violated does not compel the imposition of sanctions." *New V&J Produce Corp. v. NYCCaterers Inc.*, No. 13cv04861 (ER), 2014 WL 5026157, at *6, *8 (S.D.N.Y. Sept. 29, 2014) (finding that an attorney violated Rule 11 by erroneously claiming diversity of citizenship, but not imposing sanctions because, while the attorney's conduct was "certainly deficient," it was "based on [a] good faith, if mistaken belief"). In exercising its discretion to impose sanctions, a court should use caution, *see, e.g.*, *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 478 (S.D.N.Y. 2013), as the imposition of sanctions is an "extreme measure," *Fleming v. Hymes-Esposito*, No. 12cv1154 (JPO), 2013 WL 1285431, at *11 (S.D.N.Y. Mar. 29, 2013). Indeed, "[a] finding that someone has engaged in sanctionable conduct is a finding that itself carries a sting." *New V&J Produce Corp.*, 2014 WL 5026157, at *9 (internal quotation marks and citation omitted).

      i.     **Standards for Finding Sanctionable Conduct**

When sanctions are sought by a party on motion, Rule 11 violations "'require[] only a showing of objective unreasonableness on the part of the attorney or client signing the papers.'" *ATSI Communications, Inc., v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009) (quoting *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997), and noting that, since Rule 11 requires the

signer of a pleading to conduct an inquiry that is "reasonable under the circumstances," the standard for liability is "objective unreasonableness").

In contrast, when a trial judge initiates a Rule 11 sanction proceeding *sua sponte* after an action has concluded, sanctions may only be imposed upon a finding of subjective bad faith. *See In re Pennie & Edmonds, LLP*, 323 F.3d 86, 91 (2d Cir. 2003) (holding that, where sanctions are "initiated by the District Court long after [the party] ha[s] an opportunity to correct or withdraw the challenged submission . . . a 'bad faith' standard, applicable for contempt proceedings, is especially appropriate . . . ."); *ATSI Communications,* 579 F.3d at 150 (recognizing that *Pennie* created "an exception to the standard of objective unreasonableness applicable when a district court initiates Rule 11 sanctions *sua sponte* long after the sanctioned lawyer had an opportunity to correct or withdraw the challenged submission" and that "[i]n such cases, a lawyer may be sanctioned only upon a finding of subjective bad faith" (internal quotation marks and citation omitted)).

In *Pennie*, the Second Circuit considered, for the first time, the appropriate standard for *sua sponte* sanctions in light of the 1993 amendments to Rule 11, which added a "safe harbor" provision to the Rule. *See* Fed. R. Civ. P. 11 advisory committee's note; *Pennie*, 323 F.3d at 88. In its analysis, the court noted that, where a sanctions proceeding is initiated by a party's motion, the safe-harbor provision delays the non-offending party from filing the motion until 21 days after it has been served on the accused attorney, and the motion may be filed only if the challenged submission has not been "withdrawn or appropriately corrected." *Id.* at 89 (quoting Fed. R. Civ. P. 11(c)(1)(A)). When a sanctions proceeding is initiated *sua sponte* after the parties no longer have a chance to withdraw or amend the challenged pleading, however, the safe harbor is not available. *Id.* Thus, the Second Circuit reasoned that the "power of the court under

23

Rule 11 to issue sanctions *sua sponte* without affording the offender the opportunity to withdraw the challenged document in the manner provided in the 'safe harbor' provision . . . is akin to the court's inherent power of contempt." *Muhammad v. Walmart Stores East, L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (per curiam) (summarizing the *Pennie* Court's rationale); *see also Brown v. Kay*, No. 11cv7304 (PAE), 2012 WL 573198, at *1 (S.D.N.Y. Feb. 21, 2012) (noting that the *Pennie* Court chose to "apply[] the higher standard of subjective bad faith to . . . post-litigation sanctions motions [in order to] balance[] the interest in discouraging attorneys from making improper submissions with the risk of over deterring attorneys . . . ."). *Pennie* concluded that, where "a *sua sponte* Rule 11 sanction denies a lawyer the opportunity to withdraw the challenged document pursuant to the 'safe harbor' provision of Rule 11(c)(1)(A), the appropriate standard is subjective bad faith." *Pennie*, 323 F.3d at 87.

*Pennie* and its progeny hold that the bad faith standard applies when sanctions proceedings are initiated by a district court "long after" the party has an opportunity to correct or withdraw the challenged submission. *Pennie*, 323 F.3d at 92; *see also ATSI Communications*, 579 F.3d at 150. While *Pennie* does not specifically define "long after," in *Pennie* itself the district court had issued a *sua sponte* order to show cause (initiating a sanctions proceeding) at the end of its opinion granting summary judgment. *Id.* at 88. Based on this, it seems clear that, if the court initiates sanctions proceedings while simultaneously concluding an action, the bad faith standard applies.[10]

---

[10] *Pennie* did not determine whether the same standard would apply in sanctions proceedings commenced by a court *sua sponte*, where an opportunity to correct or withdraw the challenged submission still remained. *Id.* at 91-92 ("We need not decide the standard for a sanction proceeding initiated earlier in the litigation at a time when the challenged submission could be corrected or withdrawn as part of the lawyer's response to the show cause order, even though the Rule does not explicitly guarantee a "safe harbor" protection in such circumstances.").

Although *Pennie* "drew a sharp dissent," *see ATSI Communications*, 579 F.3d at 150

(noting that the *Pennie* dissent "argued that all Rule 11 violations should be assessed under the

standard of objective reasonableness . . ."), and while other circuits have declined to follow its

holding, *see, e.g. Young v. City of Providence ex rel. Napolitano*, 404 F. 3d 33, 39 (1st Cir.

2005); *Jenkins v. Methodist Hospitals of Dallas, Inc*., 478 F. 3d 255, 264 (5th Cir. 2007), *Pennie*

remains good law in this circuit, *see, e.g., Rivas v. Bowling Green Assocs., L.P*., No. 13cv07812

(PKC), 2014 WL 3694983, at \*1 (S.D.N.Y. July 24, 2014) ("The Second Circuit has concluded

that in the case of court-initiated Rule 11 sanctions, where the "safe-harbor" provision of

Rule 11(c)(1)(A) does not apply, the standard to be applied is not one of objective

unreasonableness, but subjective bad faith."); *Castro v. Mitchell*, 727 F. Supp. 2d 302, 309

(S.D.N.Y. 2010) ("[A] court cannot impose sanctions after a party is no longer able to withdraw

or amend its challenged pleading unless the court makes a finding of subjective bad faith.");

*Brown*, 2012 WL 573198, at \*4 (noting that, when bringing sanctions *sua sponte* after issuing an

order to dismiss, the court must be "mindful of the high hurdle presented by the subjective bad

faith standard," and that "without such a finding, professional conduct that might be held

objectively substandard or unreasonable is insufficient, without more, to justify sanctions in a

proceeding undertaken pursuant to Rule 11(c)(3)").[11]

---

[11] It should be noted that, in a securities fraud action brought pursuant to the Private Litigation Securities Reform Act ("PLSRA"), Rule 11 sanctions may be imposed *sua sponte* based on a finding that a litigant's conduct was objectively unreasonable, as the PLSRA itself contains mandatory sanctions provisions that have been construed to "put[] private securities litigants on sufficient notice that their actions will be the subject of Rule 11 findings." *ATSI Communications*, 579 F.3d at 152 (distinguishing *Pennie*).

### ii.     Meaning of "Subjective Bad Faith"

In the years following *Pennie*, courts in the Second Circuit "found subjective bad faith in a variety of cases, 'ranging from those involving overtly dishonest or contemptuous behavior, down to those where the court simply regarded an argument as frivolous.'" *Cardona v. Mohabir*, No. 14cv1596 (PKC), 2014 WL 1804793, at *3 (S.D.N.Y. May 6, 2014) (quoting *In re Gushlak*, No. 11mc00218 (NGG), 2012 WL 2564523, at *2 (E.D.N.Y. July 2, 2012) (collecting cases)). In recent years, however, courts in this circuit have clarified that the subjective bad faith standard, as applied in the context of *sua sponte* Rule 11 sanctions, requires an attorney to have *actual knowledge* that a pleading or argument that he or she is advancing is frivolous.

In the Eastern District of New York, for example, the standard for subjective bad faith has been referred to as "frivolous plus." *In re Gushlak*, 2012 WL 2564523, at *2 (holding that "it is not sufficient to find that a legal argument is frivolous," to reach a finding of subjective bad faith; rather, "[t]here must also be either direct or circumstantial evidence that counsel knew that the argument was without merit"). The Western District of New York has adopted a similar definition of subjective bad faith. *See Kleehammer v. Monroe Cnty.*, No. 09cv06177 (CJS), 2013 WL 1182968, at *10 (W.D.N.Y. Mar. 20, 2013), *appeal dismissed*, 585 F. App'x 18 (2d Cir. 2014) (applying the "frivolous plus" standard, and finding an attorney's conduct constituted subjective bad faith where the attorney "knew the representations [made to the Court] were false and . . . submitted them with a motive to mislead the Court, so as to gain an advantage in the litigation by avoiding summary judgment"); *see also Rankin v. City of Niagara Falls*, 293 F.R.D. 375, 387 (W.D.N.Y. 2013), *aff'd sub nom. Rankin v. City of Niagara Falls, Dept. of Public Works*, 569 Fed. App'x. 25 (2d Cir. 2014) (Summary Order) (noting that the "higher *mens rea* standard of subjective bad faith . . . can be satisfied by a misleading representation to a district

26

court for an improper purpose," and finding subjective bad faith where an attorney intentionally misled a magistrate judge so as to interfere with his discretion in issuing a scheduling order).

Although this Court has generally not required evidence that an attorney acted with an improper purpose, *see Cardona*, 2014 WL 1804793, at *3-4, the Court has agreed with others in the circuit that "actual knowledge" is required to satisfy the subjective-bad-faith standard, *see id.*; *see also, e.g., Rivas*, 2014 WL 3694983, at *2 ("To satisfy the subjective bad faith standard for a sanction under Rule 11(b)(2), the lawyer must have known that the legal contention was not warranted by existing law or its modification or extension. . . . Proof of actual knowledge, and not merely what a reasonable attorney should have known, is required.") (internal citation omitted). The Court has noted, however, that the requisite actual knowledge may be demonstrated by circumstantial evidence and inferred from conscious avoidance. *See Cardona*, 2014 WL 1804793, at *3-4 ("Evidence that would satisfy the knowledge standard in a criminal case ought to be sufficient in a sanctions motion and thus, knowledge may be proven by circumstantial evidence and conscious avoidance may be the equivalent of knowledge."); *Rivas*, 2014 WL 3694983, at *2.

In light of the "actual knowledge" requirement, a finding of subjective bad faith cannot be based on evidence of reckless or negligent conduct by counsel in representing a client. Rather, court-initiated sanctions may be imposed against an attorney for negligent or reckless conduct only when that attorney was acting in his or her capacity as an officer of the court, as opposed to as a client representative. *See U.S. v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000) (holding that, "when [an attorney's] actions are taken on behalf of a client, the district court must make an explicit finding of bad faith," but when an attorney is sanctioned for "conduct not inherent to client representation, such as, violations of court orders or other conduct which

27

interferes with the court's power to manage its calendar and courtroom," including arriving late
to court, the district court need not find bad faith); *see also Pennie*, 323 F.3d at 93 (explaining
that an attorney acting in his or her non-representational capacity as an officer of the court may
be appropriately sanctioned for reckless or negligent conduct, while a lawyer acting as a
representative of his or her client must meet the heightened standard of bad faith before sanctions
may be imposed); *accord Bernhardt*, 676 F. Supp. 2d, at 306.

Additionally, an attorney may not be found to have acted in bad faith when he or she has
relied on a "client's statements as to factual claims when those statements are objectively
reasonable." *Calloway v. Marcel Entertainment Group*, 854 F.2d 1452, 1479 (2d Cir. 1988),
*rev'd in part on other grounds sub nom. Pavelic & LeFlore v. Marvel Entertainment Group*, 493
U.S. 120, 110 (1989). More specifically, an attorney who relies on a client's verification made
under the penalty of perjury is not acting in bad faith; indeed, it is unlikely that such reliance
would even rise to the level of objective unreasonableness. *See Optical Commc'ns Grp., Inc. v.
M/V AMBASSADOR*, 938 F. Supp. 2d 449, 465 (S.D.N.Y. 2013), *aff'd* 558 F. App'x 94 (2d Cir.
2014) (denying motion for sanctions and holding "we cannot conclude that it was objectively
unreasonable for counsel to rely on [the plaintiff's] representations, as suspect as they may be").

### b.   Section 1927

In addition to Rule 11(c), 28 U.S.C. §1927 authorizes a court to impose sanctions. The
statute provides that an attorney "who so multiplies the proceedings in any case unreasonably
and vexatiously may be required by the court to satisfy personally the excess costs, expenses and
attorney's fees reasonably incurred because of such conduct." 28 U.S.C. §1927; *see, e.g. United
States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948
F.2d 1338, 1345 (2d Cir. 1991) ("By its terms, § 1927 looks to unreasonable and vexatious

28

multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics.").

To impose sanctions pursuant to Section 1927, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith – that is, 'motivated by improper purposes such as harassment or delay.'" *Zlotnick v. Hubbard*, 572 F. Supp. 2d 258, 272 (N.D.N.Y. 2008) (quoting *Eiseman v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000)); *see also Arclightz & Films Pvt. Ltd. v. Video Palace, Inc.*, No. 01cv10135 (SAS), 2003 WL 22434153, at *7 (S.D.N.Y. Oct. 24, 2003) ("Section 1927 authorizes the imposition of sanctions when there is a clear showing of bad faith on the part of the attorney." (internal quotation marks and citation omitted)). In the context of Section 1927, bad faith "can be inferred when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir. 1996) (internal quotation marks and citation omitted). Under this statute, "[b]ad faith conduct may include pursuing frivolous contentions, frivolous motions, or intentionally dilatory conduct." *Arclightz*, 2003 WL 22434153, at *7 (internal quotation marks and citation omitted). The statute, however, should be "construed narrowly and with great caution, so as not to stifle zealous advocacy." *Id.* (internal quotation marks and citation omitted).

Unlike sanctions under Rule 11, sanctions pursuant to Section 1927 may be "imposed only against offending attorneys; clients may not be saddled with such awards." *Int'l Bhd of Teamsters*, 948 F.2d at 1345; *see also Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

c.     **Inherent Authority of the Court**

"Finally, a court has a third means at its disposal for sanctioning improper conduct: its inherent power." *Int'l Bhd of Teamsters*, 948 F.2d at 1345. The Court's inherent authority stems from its need to be able to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted). "Separate from Rule 11, a district court has the inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons." *Zlotnick*, 572 F. Supp. 2d at 272 (W.D.N.Y. 2008); *see also Sassower v. Abrams*, 833 F. Supp. 253, 272 (S.D.N.Y. 1993).

The Supreme Court has made clear that a court's inherent power to sanction "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also Int'l Bhd of Teamsters*, 948 F.2d at 1345 (noting that, "because of the very potency of a court's inherent power, it should be exercised with restraint and discretion" (internal quotation marks and citation omitted)). For this reason, the Second Circuit "has always required a particularized showing of bad faith to justify the use of the court's inherent power." *Int'l Bhd of Teamsters*, 948 F.2d at 1345. Further, the showing of bad faith must be based on "clear evidence that the challenged actions [were] entirely without color, and [were] taken for reasons of harassment or delay or for other improper purposes." *Id.* (internal quotation marks and citation omitted).

Certainly, if a court finds that "fraud has been practiced upon it," it may, in the exercise of its inherent authority, "assess attorney's fees against the responsible party." *Chambers*, 501 U.S. at 46 (internal quotation marks and citation omitted). Yet "an isolated instance of perjury, standing alone, will not constitute a fraud upon the court." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002):

30

> Rather, fraud upon the court occurs where a party has acted
> knowingly in an attempt to hinder the fact finder's fair adjudication
> of the case . . . . In other words, a fraud upon the court occurs
> where it can be demonstrated, clearly and convincingly, that a
> party has sentiently set in motion some unconscionable scheme
> calculated to interfere with the judicial system's ability impartially
> to adjudicate a matter by improperly influencing the trier or
> unfairly hampering the presentation of the opposing party's claim
> or defense.

*Id.* (internal quotation marks and citation omitted).

Accordingly, as a general matter, a court should not impose sanctions on a party or attorney pursuant to its inherent authority unless it finds, by clear and convincing evidence, that the party or attorney knowingly submitted a materially false or misleading pleading, or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly.

### 2.      This Court's Findings and Recommendations

In evaluating whether sanctions should be imposed against Braun and/or his counsel, the "subjective bad faith" standard must be applied. The sanctions proceedings against Braun and L&K were initiated by the Court *sua sponte*, by Order dated March 18, 2015. (Dkt. 40.) This was after the Court had granted Braun's motion for the dismissal of his claims (Dkt. 39), having previously rejected the parties' stipulated dismissal. As the Court thus deprived Braun and L&K of the opportunity to withdraw the improperly asserted claims voluntarily, the *Pennie* rationale applies, and the Court must find that the offending parties acted with subjective bad faith before imposing sanctions pursuant to Rule 11. *See Pennie*, 323 F.3d at 91. Similarly, as set out above, sanctions pursuant to Section 1927 and the Court's inherent authority also require a finding of bad faith. (*See supra*, at Sections B(1)(b)-(c).)

31

a.  **Braun**

Based on the factual record set out above, there is no question that Braun falsely stated, in a verification that was expressly made under penalty of perjury, that he had reviewed the Complaint in this action and that the facts therein were true to his own knowledge. The Complaint asserted that Braun held and continued to hold shares of ABAT stock, but, as of the date the Complaint was filed, this was plainly not true.

Nonetheless, and even though Braun testified at the hearing that he understood the meaning of "perjury," this Court cannot find that Braun intended to deceive the Court, or that he deliberately made a false statement for an improper purpose. To the contrary, it appears that Braun believed that he was going to be one of many plaintiffs in a securities class action, that L&K could be trusted to prepare a pleading that reflected this, and that he was signing off on a lawsuit that accurately reflected that he was an eligible class member. Especially given the fact that the record contains no evidence indicating that Braun was ever provided with a copy of the Complaint in this derivative suit, that L&K ever explained to him that it wished to proceed with such an action, that the firm ever asked him to sign a retainer agreement for representation in such an action, or that anyone ever spoke to him about the particular facts that he was being asked to verify, this Court finds that Braun did not understand the full import of the document that was sent to him by counsel for his signature. Under these circumstances, this Court finds that Braun's execution of the verification, even though false, did not constitute fraud on the Court. *See McMunn* 191 F. Supp. 2d at 445.

Moreover, as Braun was not adequately informed of his obligation to hold his shares or to tell counsel of his sale, this Court finds that he did not act in bad faith by failing to do either, over the course of this suit. The only evidence that L&K has put forward that even arguably

suggests that Braun was made aware that he was serving as a plaintiff in a derivative action, as opposed to a securities class action, is the one email sent to him by Hopkins in May 2013, regarding a potential settlement. (Hopkins Aff., Ex. 5.) Read from the perspective of an uneducated lay client, this email can hardly be said to have clarified either the nature of this action, or of Braun's role and obligations. (*See id.* (referencing, without explaining, "the shareholder derivative action," "a parallel federal securities fraud class action," a "motion to dismiss" that was denied, and settlement discussions).) The email also does not reference any prior, specific communications with Braun; at most, the email vaguely states, "*[a]s you are likely aware*, there was a parallel . . . class action also pending . . . ." (*Id.* (emphasis added).) Based on the record as a whole, this Court finds that Braun's pre-suit sale of his shares, and his failure to step forward to inform counsel of the sale when it appears that he was never told to do so, are not sanctionable.

### b.   Garber

Of the players in this debacle, this Court finds that Garber, the associate at L&K who drafted and signed the Complaint as counsel, is the least at fault. This Court accepts that, as the associate on the case, Garber was not given direct client contact, and that, in preparing the Complaint, he relied on information that was provided to him by his colleagues. In addition, this Court finds that Garber testified credibly that, before the Complaint was finalized, he gave it to the partner on the case for review, and that he did not sign the pleading until he first saw Braun's executed verification, which he understood to confirm that the alleged facts were true to Braun's knowledge.

In these circumstances, and given the Court's obligation to resolve all doubts in favor of the signer of the pleading, *see Carlton Group,* 2003 WL 21782650, at *8, this Court finds that

33

Garber's reliance on others, including Braun, was reasonable and that Garber did not knowingly submit a false document to the Court, *see Calloway,* 854 F.2d at 1479 (2d Cir. 1988); *Optical Commc'ns Grp.,* 938 F. Supp. 2d at 465.  Further, as Garber left L&K only about two months after the Complaint was filed, he had no role in the continuation of this action for the following three-plus years.  In all, for the limited part he played, this Court finds that Garber acted in good faith, and I therefore recommend that he not be sanctioned.

### c.    **Hopkins and L&K**

Unlike Garber's conduct, which is understandable to this Court, Hopkins' conduct in commencing and maintaining this action is largely unfathomable.  This Court has difficulty getting its arms around the story that it has been told, in which the partner who was assigned to handle this case as counsel of record seems never to have even picked up the phone and introduced herself to her client, much less to have had any communication with him to ensure, before the case was filed, that she and he were on the same page.  It is this Court's view that what happened here is that L&K, as a firm, wanted to "get a piece" of the litigation against ABAT, and the firm's representation of Braun, as a *client*, was secondary, at best.  Whether it was Cargil who failed in the "intake" of this case, or Hopkins who failed by neglecting to communicate with Braun once she was placed on the engagement, or the firm, in general, that failed to establish or follow appropriate procedures to satisfy its duty of reasonable inquiry, there is no question that there was, as Hopkins testified, a "breakdown" of process in the initiation of this action.  Additionally, having failed, at the outset, to educate Braun regarding his need to retain his shares in ABAT, and by then failing to have even routine communications with him during the course of the litigation, Hopkins and L&K managed to ensure that the initial breakdown persisted.

34

Specifically, based on the evidence presented, this Court finds the following facts:

    (1)    Without first determining whether Braun could be an adequate class representative, L&K asked him to sign a retainer agreement for the firm to represent him as a named plaintiff in a securities class-action suit;

    (2)    L&K unilaterally made the decision to pursue a shareholder derivative suit with Braun as plaintiff, instead of a class action, without explaining the change to Braun or obtaining his consent, and without having him sign a new retainer agreement;

    (3)    L&K asked Braun to sign a verification of the facts alleged in a derivative Complaint, without sending him a draft of the Complaint to review;

    (4)    Neither Hopkins nor any other L&K attorney ever reviewed or discuss the factual allegations of the Complaint with Braun;

    (5)    L&K did not, prior to the commencement of the derivative action, obtain an account statement to confirm that Braun actually owned shares in ABAT;

    (6)    Neither Hopkins nor any other L&K attorney ever informed Braun that he would be obligated to maintain his shares during the course of the derivative action; and

    (7)    Hopkins, as the partner on the case, barely communicated with Braun over the entire course of this litigation, including with respect to the firm's strategy decisions (a) to coordinate with the state action; (b) to agree to a stay of this case; (c) to allow settlement discussions to continue for approximately a year from the time the stay was lifted, without any discovery being taken on the derivative claims; and (d) to continue to refrain from any active pursuit of the litigation even after Court disapproved the settlement put forward by counsel.

This conduct, at a minimum, constituted gross negligence, and, if this could be sufficient to warrant the imposition of sanctions, this Court would not hesitate to recommend that both Hopkins and the firm be sanctioned. In the posture of this case, however – where the Court is

35

considering sanctions after dismissing the action, and where counsel engaged in the conduct in question in her representational capacity – the law discussed above provides that negligence, or even recklessness, is not sufficient. *See Pennie*, 323 F.3d at 91; *Seltzer*, 227 F.3d at 41-42. At bottom, this Court cannot find that Hopkins or anyone else at L&K acted with the requisite bad faith. There is nothing in the record, even circumstantially, to suggest that Hopkins or anyone else at the firm had *actual knowledge* that the Complaint contained a false allegation regarding Braun's standing to sue, and it is not enough that Hopkins or her colleagues *should have known* that the firm was pressing a frivolous claim. *See Cardona*, 2014 WL 1804793, at *3-4; *Rivas*, 2014 WL 3694983, at *2.

The record also does not support a finding that Hopkins and/or others engaged in "conscious avoidance" of the truth – conduct which may be considered the equivalent of bad faith. *Rivas*, 2014 WL 3694983, at *2. While Hopkins described client intake procedures that were either flawed, sloppily executed, or flat-out ignored, nothing suggests that Hopkins or anyone else at L&K consciously avoided learning that Braun had sold his shares. Rather, it appears that, at the outset of the representation, lawyers simply assumed, mistakenly, that others in the firm had communicated with Braun and checked the relevant facts, and that, later in the litigation, counsel was just purely neglectful with respect to client consultation.

Upon finally learning that Braun had sold his shares, Hopkins attempted to dismiss the case voluntarily, with prejudice. Within three business days of learning about the sale, Hopkins informed opposing counsel that her client lacked standing (Hopkins Aff., Ex. 7), and she then apparently prepared a stipulation of dismissal (*see id.*; Dkt. 26). At the hearing before this Court, Hopkins also apologized to the Court and stated multiple times that she took full responsibility for the situation. (*See* Tr., at 18:12-14, 20:5-9, 39:11-17.)

36

Thus, despite the objectively unreasonable manner in which this case has been handled from inception, this Court does not find that Hopkins or L&K knowingly made false representations to the Court, unreasonably or vexatiously multiplied the proceedings for an improper purpose such as harassment or delay, or engaged in a deliberate or unconscionable scheme to interfere with the Court's ability to adjudicate any party's claims. For these reasons, and given the precedent in this circuit cautioning against the imposition of sanctions where not fully warranted under the applicable standards, I am constrained to recommend that sanctions not be imposed against Hopkins or L&K.[12]

## II.    NON-PARTY CAPLAN'S MOTION FOR PAYMENT OF AN "INCENTIVE AWARD, COSTS, FEES AND ATTORNEY'S CONSULTATIONS"

Also before the Court is the motion filed *pro se* by Caplan, a non-party ABAT stockholder, seeking sanctions against Braun and/or L&K in the form of a payment *to him.* (*See* Motion for Payment of Incentive Award, Costs, Fees and Attorney's Consultations for Pro-Se Settlement Objector Joel Caplan, filed Apr. 15, 2015 ("Caplan Mot.") (Dkt. 54).) In Caplan's view, such a payment would be appropriate as an "incentive award" for the efforts he has made to bring certain issues in this case to light for the Court, and to reimburse him for the costs that he has incurred in connection with those efforts. (*See id.*)

---

[12] For the same reasons, I also recommend that, to the extent ABAT's submissions setting out its attorney's fees (Dkts. 45, 47) may be construed as a fee application, that application be denied. ABAT did not actually request sanctions, but, as noted above (*see supra* at n.7), its counsel did submit certain attorney time records after Judge McMahon directed that this Court consider a possible award of ABAT's attorneys' fees as part of any sanctions that might be imposed against Braun and/or L&K (*see* Dkt. 40).

37

A.   **Caplan's Involvement in This Case**
     **and His Several Requests for Compensation**

Although Caplan was not present at the sanctions hearing conducted by this Court, he has

regularly corresponded with the Court regarding this case and has otherwise attended

proceedings throughout this action.[13] Most notably, when the parties' counsel placed the

proposed settlement before the Court, Caplan objected, calling attention to some of its

deficiencies, thereby informing Judge McMahon's decision to reject the proposed agreement.

(*See* Dkt. 38 (Response to Objector's Request for Appointment of Counsel, dated Feb. 25, 2015),

at 2 (Court noting that, "[i]n reaching this conclusion [to decline approval of the settlement],

I was enlightened by Mr. Joel Caplan, a shareholder who had lost a great deal of money in

ABAT, and who showed up to object to the settlement of the derivative action . . .").)

Judge McMahon stated in a written opinion, in fact, that she was "grateful to Mr. Caplan for his

efforts in this case," observing that "he ha[d] in some respects been more helpful than the

lawyers" (*id.* at 3), and, at another point, she told Caplan that he "ha[d] been the best litigator in

the room" (Oct. Tr. 7:7-8).

On October 21, 2014, Caplan attempted to involve himself formally in this action by

submitting a motion to intervene.  (*See* Motion to Intervene, dated October 21, 2014 ("Mot.

Intvn.") (Dkt. 64.))  The Court denied the motion because, as Judge McMahon explained to

Caplan, an unrepresented party may not intervene in a shareholder derivative action.  (*See* Oct.

Tr. 2:17-23 (Court:  "A pro se individual . . . cannot maintain a derivative suit; you can't come in

unless you go out and hire a lawyer.").)  Once it was revealed that Braun lacked standing to

_____

[13] Caplan's involvement with this case is detailed in his motion.  (*See id.*, at 3-5.)  He was
unable to attend the sanctions hearing because he was in Israel at the time, for the Passover
holiday (*see* Tr. 3:13-24:16), but, in advance of the hearing, he did send this Court a list of topics
and questions that he asked the Court to explore at the hearing (*see* Dkt. 43).

pursue this case, Caplan requested that *L&K* represent him, in lieu of representing Braun. (*See*
Oct. Tr. 5:21-22:2; *see also* Dkt. 43, Ex. 1.) Citing a conflict of interest, however, L&K declined
the representation. (*See* Oct. Tr. 6:10-12 (Hopkins noting that, even apart from the fact that
Caplan had objected to the proposed settlement, Caplan had stated "in his proposed intervention
that the parties were not being adequately represented").) Then, on February 25, 2015, in
another attempt to obtain counsel for the purpose of intervening, Caplan filed an application for
the Court to request a *pro bono* attorney to represent him. (Dkt. 37.) This request was also
denied, as the Court found that Caplan was not indigent, and that his involvement in this action
was motivated by his desire to recoup money he had lost in ABAT, rather than to protect ABAT
shareholders. (*See* Dkt. 38 ("While I appreciate that Mr. Caplan lost a great deal of money by
investing in [ABAT] . . . this Court does not have lawyers who can take cases for people who are
not themselves poor, but who simply want to stop hemorrhaging money.").)

Once it became clear that this lawsuit should not have been commenced by Braun,
Caplan also began to make applications to the Court seeking compensation from Braun and/or
L&K for both the time he had put into the case and the losses he had suffered as an ABAT
shareholder. First, on March 2, 2015, he wrote to Judge McMahon with such an application;[14]
then, on April 14, 2015, he filed the motion that is presently before the Court (Caplan Mot.); and

---

[14] *See* Letter Motion in Support of Defendants's [sic] Request for Cost and Relief to be
Redirected to a Court Held Fund and to Objector/Shareholder Activist Joel Caplan, dated Mar. 2,
2015 ("3/2/15 Caplan Ltr.") (Dkt. 63 at Ex. 1). Caplan faxed this letter to Judge McMahon's
chambers on March 2, 2015, but, when it was not docketed, he re-sent it via express mail on
March 12, 2015. It appears that, due to a delay in mail delivery, this re-sent copy did not arrive
at the Court until March 17, 2015, the same day that the Court granted Braun's motion to dismiss
the Complaint. (*Id.* at Ex. 2-3.)

39

then, on April 30, 2015, he wrote again to this Court,[15] presenting further argument as to why a monetary award in his favor was warranted.

Each of these submissions sought compensation within a sanctions framework. In his March 2 application to Judge McMahon, Caplan asked the Court to direct L&K to pay "all or a portion of ABAT's cost to defend itself from this bogus action" (3/2/15 Caplan Ltr., at 1), but also requested that, instead of directing that the money to be paid directly to ABAT, the Court create an escrow fund holding the money for other potentially aggrieved shareholders while the Court determined whether ABAT should be eligible to receive fees (*see generally id.*). Caplan further requested that his expenses related to this litigation be paid from that fund. (*Id.*) In his April 14 motion, Caplan specifically sought, as part of any sanctions imposed against Braun and/or L&K, a payment of $29,230, comprised of $19,230 as compensation for his purported time and expenses related to this action,[16] and an additional "incentive/service fee award of $10,000 for providing value to the Court, the company, the shareholders, the Settling Parties, the

---

[15] Caplan sent Part 1 of his letter response to Hopkins' post-hearing brief to my Chambers via fax on April 17, 2015, and Part 2 of the letter on April 20, 2015. When the letter was not docketed, Caplan re-sent both parts, together, via U.S. mail, on April 30, 2015. His April 30 cover letter, together with the two parts of his earlier letter, were then docketed by the Court (*see* Letter Response to Post-Hearing Brief, Part 1 and Part 2, dated Apr. 30, 2015 (Dkts. 62-63)), and will be referred to herein, collectively, as "4/30/15 Caplan Ltr."

[16] Caplan presented a breakdown of this $19,230 as follows (using a rate of $60/hour for his personal time):

1) $5,000 for Attorney Fees;
2) $8,180 for Time to Object, Letters, Attendance at 2 Hearings and 1 Status Conference (including lost work days);
3) $3,500 for cost of researching Pacer Documents and Time Spent;
4) $150 for Administrative Expenses;
5) $2,300 for Travel Expenses to New York (3 times); and
6) $3,600 for Travel Expenses to China (3 times).

(*See id.*, at 1, 11-12.)

integrity of the US capital markets and overall justice in this and similar matters." (Caplan Mot., at 1.) Finally, in his April 30 submission, Caplan reiterated his request for payment as part of a sanction, although he seemed to suggest that sanctions be imposed more heavily against Braun than against L&K, as, in his view, the firm "likely did not act in 'bad faith.'" (4/30/15 Caplan Ltr., Part 2, at 7-10 (Dkt. 62).)

In response to Caplan's April 14, 2015 Motion, Hopkins submitted an Affidavit, as well as an opposition memorandum on behalf of both Braun and L&K. (*See* Affidavit of Shannon L. Hopkins in Support of Opposition to Motion for Payment of Incentive Award, Costs, Fees, and Attorney's Consultation for Pro-Se Settlement Objector Joel Caplan, sworn to Apr. 17, 2015 ("4/17/15 Hopkins Aff.") (Dkt. 56); Plaintiff Carl Braun and His Counsel Levi & Korsinsky LLP's Memorandum in Opposition to Motion for Payment of Incentive Award, Costs, Fees and Attorney's Consultation for Pro-Se settlement Objector Joel Caplan ("Pl. Opp. Mem."), dated Apr. 17, 2015 (Dkt. 55).) In her Affidavit, Hopkins stated that she had received a phone call from Caplan on March 30, 2015, during which he asked "if L[&]K would agree to pay him some unspecified amount of money in exchange for Caplan 'going easier' on L[&]K on the questions he intended to submit to the Court at the April 7, 2015 OSC Hearing." (4/17/15 Hopkins Aff. ¶ 4.) Hopkins asserted that she "told Mr. Caplan that his suggestion was inappropriate and declined." (*Id.*) In the submitted brief, Hopkins additionally informed the Court that "this [was] not the first time Caplan ha[d] sought to obtain money from counsel in this Action," (Pl. Opp. Mem., at 1), and cited two emails that Caplan had sent to ABAT's counsel (Shalov), in which Caplan made offers for "private transactions" in which ABAT would acquire Caplan's shares, and threatened to object to the proposed settlement agreements if his offers were not accepted (*see id.*; *see also* Letter to the Court from Shalov, dated Jan. 13, 2014, Ex. 2 (Dkt. 18)).

### B.    Lack of Basis for an Award to Caplan

Regardless of whether Caplan has expended time on this case or has provided a service to the Court, he does not have standing to seek sanctions in this action. "Although the language of Rule 11 does not address the issue of who may move for sanctions, the language used in the Advisory Committee Notes indicates that it is the *parties* who should move for sanctions." *Sean Michael Edwards Design, Inc. v. Pyramid Designs*, No. 98cv3700 (BSJ), 1999 WL 1018072, at *1 (S.D.N.Y. Nov. 9, 1999) (emphasis added). Indeed, the Second Circuit has held that a non-party generally lacks standing to seek Rule 11 sanctions. *See New York News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992) (holding that, with the possible exception of a non-party who was involuntarily involved in a case, a non-party would not be entitled to move for sanctions "unless he satisfied the intervention requirements of Rule 24 [of the Federal Rules of Civil Procedure]"); *see also Pinpoint IT Servs., L.L.C. v. Atlas IT Exp. Corp.*, 802 F. Supp. 2d 691, 694 (E.D. Va. 2011) (following *Kheel*, and holding that a non-party does not have standing to move for Rule 11 sanctions, even if that non-party was mentioned in a memorandum filed with the court); *cf. Hochen v. Bobst Group*, 198 F.R.D. 11, 14-15 (D. Mass. 2000) (noting that non-parties who are brought in or attempted to be brought into litigation involuntarily may have standing to bring a motion for sanctions).

In any event, if the Court may not impose sanctions against either Braun or L&K because of the lack of evidence of subjective bad faith, then, by extension, the Court cannot award compensation to Caplan as "part" of such sanctions. Caplan's motion is entirely predicated on

monetary sanctions being imposed against Braun and/or his counsel, and, without such sanctions, his motion necessarily falls.

Accordingly, I recommend that Braun's *Caplan's* motion be denied.

## CONCLUSION

For all of the reasons set out above, I respectfully recommend that sanctions not be imposed against Braun, Garber, Hopkins, or L&K; that Caplan's motion to be paid a portion of such sanctions (Dkt. 54) be denied; and that this case, having already been dismissed in its entirety, be terminated on the Docket of the Court.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon, United States Courthouse, 500 Pearl Street, Room 1640, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge McMahon. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*,

968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988);

*McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
          June 19, 2015

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)

Mr. Joel Caplan
116 Pleasant Street
Suite 249
Easthampton, MA 01027

44